MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 81
Docket:      BCD-18-524
Argued:      October 8, 2019
Decided:     June 4, 2020

Panel:       MEAD, GORMAN, JABAR, and HUMPHREY, JJ, and HJELM, A.R.J.*

STATE TAX ASSESSOR

v.

KRAFT FOODS GROUP, INC., et al.

HUMPHREY, J.

[¶1]  Kraft[1] appeals, and the State Tax Assessor cross-appeals, from a summary judgment entered in the Business and Consumer Docket (*Murphy, J.*) that adjudicated all claims on the parties' separate—but judicially consolidated—petitions for review of two tax abatement decisions.  36 M.R.S. § 151(2)(F), (G) (2020); M.R. Civ. P. 80C.  Kraft argues that the court erred in

---

* Justice Hjelm sat at oral argument and participated in the initial conference while he was an Associate Justice and, on order of the Senior Associate Justice, was authorized to continue his participation in his capacity as an Active Retired Justice.  Chief Justice Saufley sat at oral argument and participated in the initial conference but resigned before this opinion was certified. Justice Alexander sat at oral argument and participated in the initial conference but retired before this opinion was certified.

[1] The taxpayers in this case who have a connection to Maine are Kraft Foods Group, Inc., Kraft Foods Global, Inc., Kraft Pizza Company, and Cadbury Adams USA LLC.  For convenience, we refer throughout this opinion to the collective taxpayers as "Kraft," but will specify which entity we are referring to when it is necessary to do so.

2

determining that it was not entitled to an alternative apportionment[2] of part of its 2010 taxable income, that it was not entitled to a full abatement of certain penalties levied by the Assessor as part of the "First Assessment," and that the "Second Assessment" was not barred by the applicable statute of limitations. The Assessor argues that the court erred in partially abating the substantial understatement penalty levied as part of the First Assessment. We vacate the portion of the judgment that abated a portion of the penalty and affirm the remaining aspects of the judgment.

## I. BACKGROUND AND PROCEDURAL HISTORY

[¶2] The parties stipulated to the following facts. During the relevant time period, Kraft manufactured and sold various food and beverage products in Maine and throughout the United States under a wide assortment of brand names. In the 1980s and 1990s, Kraft purchased two companies that

---

[2] The default method of apportioning a business's taxable income to Maine is based on a "sales factor" formula, which "includes sales of the taxpayer and of any member of an affiliated group with which the taxpayer conducts a *unitary business*." *See* 36 M.R.S. § 5211(1), (8), (14) (2020) (emphasis added). Essentially, the sales factor formula "calculates the local tax base by first defining the scope of the 'unitary business' of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportion[s] the total income of that 'unitary business' between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 165 (1983). Once the sales factor is calculated, the taxpayer's income is "apportioned to [Maine] by multiplying the income by the sales factor." 36 M.R.S. § 5211(8).

When the sales factor formula does not fairly represent the extent of the business's activities in Maine, the Assessor may use an alternative formula to apportion the business's taxable income. *See id.* § 5211(17).

manufactured and sold frozen pizzas (Tombstone Pizza Company and Jack's Frozen Pizza), developed its own frozen pizza product (marketed as DiGiorno in the United States), and acquired a license to manufacture, sell, and distribute a line of frozen pizzas under the California Pizza Kitchen brand name. All of these brands were produced, sold, and distributed by Kraft Pizza Company (KPC).

[¶3] On March 1, 2010, Kraft sold its entire frozen pizza business, including both tangible and intangible assets, to Nestle USA, Inc. for $3,692,835,676.[3] On its 2010 federal consolidated corporate income tax return, Kraft reported taxable income on the sale in the amount of $3,349,462,365. The federal taxable income from the sale reported by members of the Kraft family of companies was broken down as follows: KPC reported $2,028,162,365 in federal taxable income, and Kraft Foods Global Brands, Inc., reported $1,321,300,000 in federal taxable income.

[¶4] In October 2011, Kraft filed its 2010 Maine corporate income tax return, which included KPC as a member of the affiliated group with which it

---

[3] The assets sold, used to manufacture and market frozen pizza, included trademarks, licenses, patents, property and manufacturing facilities, fixtures, equipment, supplier agreements and other contracts, leases, inventory, and goodwill. The sale price was paid as follows: $2,358,056,241 was paid to KPC; $1,321,300,000 was paid to Kraft Foods Global Brands, Inc.; $340,000 was paid to Kraft Foods Global, Inc.; and $13,139,435 was paid to Kraft Canada Inc.

4

conducted a unitary business, and, applying the sales factor method, reported KPC's income from the sale as part of its apportionable Maine net income.[4] However, Kraft subtracted $3,004,347,614[5] from its Maine taxable income, based on its assertion that this income was not taxable by Maine under either the Maine Constitution or the United States Constitution.

[¶5]  The effect of this subtraction was to exclude from Kraft's Maine taxable income nearly all of the gain realized from the sale, thereby reducing Kraft's Maine tax liability for 2010.  In total, on its 2010 Maine corporate tax return, Kraft reported $3,179,725,852 in federal taxable income, $502,197,939 in Maine taxable income, a Maine apportionment factor of 0.008193, and Maine corporate income tax due of $367,402.  Kraft did not include any of the roughly $3.6 billion in gross receipts from the sale when calculating its 2010 Maine apportionment factor.

[¶6] In August 2013, Maine Revenue Services (MRS) audited Kraft for tax years 2010 and 2011.  MRS adjusted Kraft's 2010 Maine corporate income tax

---

[4] Although Kraft later argued to the Board of Tax Appeals that KPC was not part of Kraft's unitary business for purposes of apportioning Kraft's taxable income, Kraft has abandoned this argument on appeal.

[5] KPC subtracted $1,989,777,098 from its Maine taxable income; and Kraft Foods Global Brands, Inc., subtracted $1,014,570,516 from its Maine taxable income.  The combined subtracted amount of $3,004,347,614 was part of Kraft's federal taxable income.

return and disallowed Kraft's subtraction of $3,004,347,614 in income derived from the sale. MRS determined that this income *was* part of Kraft's Maine taxable income, and issued a notice of assessment (the First Assessment) against Kraft in May 2014 for $1,832,717 in Maine corporate income tax, $466,363.47 in interest, and $458,179.25 in penalties for substantially understating its tax liability.

[¶7] In June 2014, Kraft requested reconsideration of the First Assessment. *See* 36 M.R.S. § 151(1) (2020). After MRS upheld the First Assessment in full, Kraft appealed to the Board of Tax Appeals. The Board determined that two different apportionment factors should be applied to calculate Kraft's Maine taxable income for the 2010 tax year: one to apportion the income from the sale, and another to apportion the remainder of Kraft's 2010 unitary business income. The Board used the following formulas:

> Kraft's unitary business income, excluding the gain [from the sale], shall be apportioned using a sales factor calculated by dividing Kraft's sales in Maine by Kraft's sales everywhere; Kraft's gain from sale of the Pizza Assets shall be apportioned using a sales factor calculated by dividing KPC's sales in Maine by KPC's sales everywhere. Neither of the above-referenced sales factors shall include the amount of Kraft's sale of the Pizza Assets in either the numerator or denominator.

The Board also fully abated the $458,179.25 penalty imposed against Kraft for substantially understating its tax liability on the ground that there was

6

"substantial authority" for Kraft's filing position. *See* 36 M.R.S. § 187-B(4-A) (2020). The Assessor filed a petition in Superior Court (Kennebec County) for judicial review of the Board's decision, *see* 36 M.R.S. § 151(2)(F), (G); M.R. Civ. P. 80C, and the case was then transferred to the Business and Consumer Docket.

[¶8] On May 3, 2017, the Assessor issued another notice of assessment (the Second Assessment), adjusting Kraft's 2010 Maine corporate income tax return to disallow a $306,729,484 capital loss carryforward that Kraft had claimed. The Second Assessment imposed an additional $192,448 in income tax, $105,168.21 in interest, and $48,112 in substantial understatement penalties.

[¶9] Kraft requested reconsideration of the Second Assessment, *see* 36 M.R.S. § 151(1), arguing that it was barred by the statute of limitations. The Assessor upheld the Second Assessment in full. Kraft filed a petition for judicial review in Superior Court without first appealing to the Board of Tax Appeals, *see* 36 M.R.S. § 151(2)(F), (G); M.R. Civ. P. 80C, and that petition was also transferred to the Business and Consumer Docket, where it was consolidated with the Assessor's petition for judicial review of the First Assessment.

[¶10]  The parties filed motions for summary judgment on both the First and Second Assessments based on a partially stipulated record.  As to the First Assessment, the court granted partial summary judgment in favor of the Assessor, reversing the Board's decision and concluding that Kraft was not entitled to an alternative apportionment of the sale income under 36 M.R.S. § 5211(17) (2020).  The court also determined that Kraft was entitled to only a partial abatement of the substantial underpayment penalty, reversing the Board's determination that Kraft was entitled to a full abatement.  As to the Second Assessment, the court granted the Assessor's motion for summary judgment based on its conclusion that the Second Assessment was not barred by the statute of limitations.

[¶11]  Kraft filed a timely notice of appeal from the court's judgment, M.R. App. P. 2B(c)(1), and the Assessor filed a timely cross-appeal.  M.R. App. P. 2C(a)(2).

## II.  DISCUSSION

[¶12]  We address four issues that the parties raise on appeal.[6]  First, Kraft argues that the court erred in concluding that, in the First Assessment, it

---

6   We have considered Kraft's remaining argument that alternative apportionment is constitutionally required pursuant to the Due Process and Commerce Clauses of the United States Constitution, and we conclude that it is not persuasive because the Supreme Court has "repeatedly

8

was not entitled to an alternative apportionment of the income from the sale for determining its Maine tax liability. Second, Kraft argues that the court erred in determining that it was not entitled to a full abatement of the penalties levied as part of the First Assessment for substantially understating its tax liability. Third, and relatedly, the Assessor, on its cross-appeal, argues that the court erred in awarding Kraft even a partial abatement of the substantial understatement penalties on the First Assessment. Finally, Kraft argues that the court erred in concluding that the Second Assessment was not barred by the statute of limitations. We address each argument in turn.

[¶13] As to each issue, the parties do not argue that there is any genuine issue of material fact; they contest only the court's legal conclusions. "When

---

held that a single-factor formula is presumptively valid." *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 273 (1978); *see also Underwood Typewriter Co. v. Chamberlain*, 254 U.S. 113, 121 (1920). Kraft's business is food product sales. Kraft reported $159,395,586 in gross receipts from Maine sales in 2010. The application of a single-factor formula to Kraft does not result in the attribution of "a percentage of income out of all appropriate proportion to the business transacted," *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell*, 283 U.S. 123, 135 (1931), because the factor used is the sales factor (i.e., Kraft's Maine sales compared to Kraft's sales everywhere), and Kraft's business is sales-driven. The sales factor, as applied to Kraft, is not improper because it "reflect[s] a reasonable sense of how income is generated." *Container Corp.*, 463 U.S. at 169.

The Court's holding in *Hans Rees' Sons, Inc.*, does not change our analysis. There, the Court held that a single-factor apportionment formula based entirely on ownership of tangible property within the taxing state violated the Constitution as applied to a business engaged in the business of tanning, manufacturing, and selling belting and other heavy leathers because the formula unreasonably and arbitrarily "attribut[ed] to North Carolina a percentage of income out of all appropriate proportion to the business transacted . . . in that State." *Id.* at 126, 135. That is not the case here.

the material facts are not in dispute, we review de novo the trial court's interpretation and application of the relevant statutes and legal concepts." *Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 19, 116 A.3d 466. When reviewing a decision of the Board of Tax Appeals, "the Superior Court is authorized to rule on legal matters de novo, [and] we review the court's interpretation of the law directly and do not defer to the interpretive ruling of the Assessor or the Board." *Warnquist v. State Tax Assessor*, 2019 ME 19, ¶ 12, 201 A.3d 602 (citations omitted); *see also* 36 M.R.S. § 151(2)(F), (G); *Metcalf v. State Tax Assessor*, 2013 ME 62, ¶ 15, 70 A.3d 261.

A.    Alternative Apportionment of the Sale Income

[¶14]  As mentioned above, *see supra* n.2, in Maine the default method of apportioning a corporate taxpayer's income is based on a "sales factor" formula. 36 M.R.S. § 5211(1), (8), (14) (2020). "The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in [Maine] during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period." 36 M.R.S. § 5211(14); *see also E.I. Du Pont de Nemours & Co. v. State Tax Assessor*, 675 A.2d 82, 83 (Me. 1996). "For purposes of calculating the sales factor, 'total sales of the taxpayer' includes

10

sales of the taxpayer and of any member of an affiliated group with which the taxpayer conducts a unitary business." 36 M.R.S. § 5211(14).

[¶15] Sometimes, however, an "alternative" apportionment method may be appropriate and statutorily available. If application of the sales factor formula would "not fairly represent the extent of the taxpayer's business activity in [Maine], the taxpayer may petition for, or the tax assessor may require, in respect to all or any part of the taxpayer's business activity, if reasonable . . . [t]he employment of any other method to effectuate an equitable apportionment of the taxpayer's income." 36 M.R.S. § 5211(17); *see, e.g., E.I. Du Pont de Nemours & Co.,* 675 A.2d at 89-90. This provision was enacted to allow the tax assessor to depart from the statutorily prescribed apportionment method in "exceptional circumstances." *See E.I. Du Pont de Nemours & Co.,* 675 A.2d at 89; *see also Twentieth Century-Fox Film Corp. v. Dep't of Revenue*, 700 P.2d 1035, 1039 (Or. 1985).

[¶16] Kraft argues that it is entitled to alternative apportionment of the income from the sale, and urges us to adopt the alternative apportionment formula implemented by the Board.[7] We decline to do so for the reasons that follow.

---

[7] *See supra ¶ 7.*

1.     Kraft's Business Activity in Maine

[¶17]   We begin by observing that Kraft, and KPC specifically, did substantial business in Maine in 2010.[8]  Kraft reported $159,395,586 in gross receipts from Maine sales that year, of which $1,109,108 was attributable to KPC.[9]  MRS determined that Kraft's Maine sales factor for 2010 was 0.007026 (0.7026%), which falls right between its 2008 and 2009 sales factors— 0.006971 (0.6971%) and 0.007370 (0.7370%), respectively.     This demonstrates that the extent of Kraft's business activities in Maine did not change significantly during those years.  Although Kraft's total taxable income in 2010 was substantially larger than in previous years because of the sale, the sales factor, which represents Kraft's business activity in Maine relative to its total business activity, remained consistent with the sales factors from other tax years.  The fact that Kraft's net income in 2010 was much greater than in previous years does not support the conclusion that the sales factor itself

---

[8]  Kraft has conceded that KPC was, in fact, a member of the "affiliated group with which the taxpayer conducts a unitary business," 36 M.R.S. § 5211(14), in 2010.

[9]  Because the sale closed on March 1, 2010, the reported figures of KPC's gross sales in Maine do not adequately represent a typical full year of Maine sales for KPC.  Kraft's filings from previous years are illuminating on this point.  In 2009, KPC reported $4,350,242 in gross receipts from Maine sales, and in 2008, KPC reported $3,875,177 in gross receipts from Maine sales.

"do[es] not fairly represent the extent of the taxpayer's business activity in [Maine]." 36 M.R.S. § 5211(17).

[¶18] Kraft also argues that an alternative apportionment of the sale income pursuant to the formula used by the Board is appropriate because the sale income was primarily generated by KPC's frozen pizza sales rather than by Kraft's overall food product sales, and "pizza was simply not a big seller in Maine relative to other Kraft products." We reject this argument because it is inconsistent with one of the core principles justifying the use of a sales factor formula to apportion the income of a unitary business for tax purposes.

[¶19] Unitary businesses like Kraft often realize "income resulting from functional integration, centralization of management, and economies of scale" that relate to the operation of the business as a whole, so it can be "misleading to characterize the income of the business as having a single identifiable 'source.'" *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 181 (1983) (quoting *Mobil Oil Corp. v. Comm'r of Taxes*, 445 U.S. 425, 438 (1980)); *see also E.I. Du Pont de Nemours & Co.*, 675 A.2d at 90 (recognizing that "arriving at precise territorial allocations of value is often an elusive goal both in theory and in practice") (quotation marks omitted); *Tesoro Corp. v. State Dep't of Revenue*, 312 P.3d 830, 849 (Alaska 2013) (declining to assume "that it is possible to

determine where the income of a unitary business is 'unquestionably generated'"). Here, KPC's frozen pizza sales cannot be set apart as the main source of the value of the assets sold to Nestle because any attempt to do so would fail to account for those "factors of profitability [that] arise from the operation of the business as a whole." *Mobil Oil Corp.*, 445 U.S. at 438.

[¶20] We also reject Kraft's contention that using the sales factor formula is unfair because KPC's Maine sales were lower than the Maine sales of other Kraft affiliates and lower than KPC's sales in other states. The record shows that Kraft grossed more from the sale of frozen pizzas in Maine than from several other product lines, a fact that undermines Kraft's attempt to downplay the significance of KPC's Maine sales. A more fundamental problem with Kraft's argument is that the Legislature has expressed a clear preference that all of a unitary business's taxable income should be apportioned according to the sales factor. *See* 36 M.R.S. § 5211(8). Given this clearly-stated preference, we are unpersuaded by Kraft's arguments. The sales factor calculation adequately addresses state-to-state variations in business activity by requiring a comparison of the business's Maine sales to its total sales everywhere and apportioning the business's income accordingly. *See id.* § 5211(14).

14

[¶21] Taken to its logical conclusion, Kraft's argument is that when there are variations in the level of sales activity among component parts of a unitary business within Maine, or variations in the level of sales activity conducted in multiple states, apportioning the unitary business's income using the sales factor formula cannot be fairly representative of the affiliated group's business activity within the State. But, as the trial court astutely observed, the alternative apportionment provision is not meant to allow an "end-run" around the statutory requirement that a unitary business be taxed as a single group. *See Tesoro Corp.*, 312 P.3d at 848 (observing that "the United States Supreme Court has rejected the argument that disparate profits across subsidiaries are indicative of unfair taxation"). The relevant inquiry is not whether any particular member of a unitary business has higher or lower sales activity in Maine compared to other states; if it were, every national and multinational corporation would be entitled to alternative apportionment on that basis.

2.      The Nature of the Sale

[¶22]    Kraft also argues that the "unusual, non-recurring, and extraordinary Pizza Gain cannot be fairly represented by a single-sales factor formula determined in principal part by gross receipts from Kraft's day-to-day food product sales." This argument misses the mark. The question is not

whether the sales factor fairly represents the sale income; the question is whether the sales factor fairly represents the extent of Kraft's business activity in Maine. *See* 36 M.R.S. § 5211(17).

[¶23] Apportionment formulas "measure the corporation's activities within and without the jurisdiction." *Tesoro Corp.*, 312 P.3d at 848 (quotation marks omitted). "[T]he sales factor is designed to attribute a taxpayer's income to the jurisdictions in which its goods and services are consumed." *Id.* A business's in-state activities are properly measured by in-state purchases and sales of goods or services, whether or not the business turns a profit on those transactions. *See id.* (rejecting the "flawed premise that a business's in-state activities are only as great as the profits it generates from its in-state activities").

[¶24] In Maine, the Legislature has made clear that the sales factor is to be calculated using total sales (i.e., gross receipts) rather than net income (i.e., profit). *See* 36 M.R.S. § 5211(14); *id.* § 5210(5) (2020) (defining "sales" as "gross receipts of the taxpayer."). Thus, contrary to Kraft's argument, apportioning Kraft's unitary business income, including the income from the sale, using "a single-sales factor formula determined in principal part by gross

receipts from Kraft's day-to-day food product sales" is precisely what the Legislature intended. *See* 36 M.R.S. § 5211(8), (14).

[¶25] Even assuming for the sake of argument that the income from the sale was generated primarily by unitary business activity that took place outside of Maine, and assuming Kraft could prove that, *see E.I. Du Pont de Nemours & Co.*, 675 A.2d at 90, that still would not mean that the sales factor does not fairly represent Kraft's unitary business activity within Maine. *See Container Corp.*, 463 U.S. at 181. Applying the sales factor to the income from the sale is consistent with the Legislature's stated preference, 36 M.R.S. § 5211(8), (14), and is not unfair to Kraft. Maine is entitled to tax its fair share of the income from the sale, calculated using the sales factor.

[¶26] Further, even if we were to assume that the sale was "extraordinary" or "unusual"—even though there is evidence in the stipulated record to suggest that it was not—that would not support the conclusion that the sales factor does not fairly represent Kraft's unitary business activity in Maine. As previously noted, Kraft's sales factor in 2010 was calculated the same way it was calculated in previous years and was consistent with the sales factors calculated by the Assessor in previous years. The only difference is that in 2010 Kraft had more taxable income to be apportioned because of the sale.

The trial court summarized the situation aptly: "Kraft was fortunate to realize an enormous profit when it sold an entire line of business to a competitor. That line of business, like many of Kraft's other product lines, was active in Maine as it was in other states; Maine only seeks to tax a small percentage of the profit realized, calculated by reference to Kraft's business activity in Maine."

3. Kraft's Remaining Arguments in Support of an Alternative Apportionment of the Sale Income

[¶27] Finally, Kraft's reliance on two cases from California, *Microsoft Corp. v. Franchise Tax Bd.*, 139 P.3d 1169 (Cal. 2006) and *General Mills, Inc. v. Franchise Tax Bd.*, 146 Cal. Rptr. 3d 475 (Cal. Ct. App. 2012), is misplaced because each case dealt with a unique "paradigm" distinct from the situation here.

[¶28] In *General Mills,* the Court of Appeal of California was concerned with a practice called "hedging," a risk management strategy involving "sales activity that is not conducted for its own profit." 146 Cal. Rptr. 3d at 489. In stark contrast, the business activity here—the sale—was plainly, and quite successfully, conducted for profit.

[¶29] In *Microsoft*, the Supreme Court of California dealt with Microsoft's treatment of income derived from its corporate treasury department's investment of excess operating cash in short-term marketable securities.

Microsoft had multi-state and worldwide subsidiaries that operated as a unitary business and generated excess operating cash. 139 P.3d at 1171-73. The company's investment activity occurred in only one state—the state in which the treasury department was located—and the investment activity generated little income but significant receipts. *Id.* at 1181. Under those unique circumstances, Microsoft's inclusion of total receipts from its short-term investment activity and receipts from its other business activity in the same calculation distorted the default formula's attribution of income to each state, and would have reduced by half the income attributed to every state other the one in which the treasury department was located. *Id.* This problem was due, at least in part, to "an implicit assumption [in the sales factor formula] that a corporation's margins will not vary inordinately from state to state." *Id.* at 1179. However, "in the absence of huge variations in state-to-state margins," the sales factor formula does not run into the problems just described. *Id.*

[¶30] The *Microsoft* court was faced with a different problem than the one presented here because, there, declining to permit alternative apportionment "would create a significant loophole exploitable through subtle changes in investment strategy." *Id.* at 1181. Under the standard formula, on the facts presented in *Microsoft*, a unitary group could reduce its state tax

liability, possibly to near zero, by shifting investments to shorter and shorter maturities. *Id.*

[¶31]  We are not presented with the issue addressed in *Microsoft*.  There, inclusion of the gross receipts resulting from the short-term investment activity distorted the income apportioned to California because the gross receipts from that activity were attributable to only one state and generated negligible amounts of income.  The inclusion of those gross receipts in the denominator of the sales factor calculation in every other state would disproportionately reduce the sales factor and therefore Microsoft's tax liability relative to the minimal income the investment activity generated.  *Id.* at 1179-80.

[¶32]   Here, the sale generated significant income relative to gross receipts, and Kraft admits that the income was mostly profit.  Because the sale was conducted for profit, unlike the investment activity in *Microsoft*, inclusion of the income from the sale in the sales factor denominator does not result in the kind of distortion seen there.  Kraft itself acknowledges that this case "present[s] the reverse of the factual situation[s]" addressed in *Microsoft* and *General Mills*.  Its attempt to analogize those cases notwithstanding, the situation here is fairly straightforward.  The sales factor, which includes Kraft's Maine sales in the numerator and Kraft's total sales everywhere (including the

gross receipts from the sale) in the denominator, fairly represents the extent of Kraft's business activity in Maine. *See* 36 M.R.S. § 5211(17).

[¶33] In sum, this case does not present the "exceptional circumstances" necessary to justify a departure from the statutorily prescribed apportionment method of calculating Kraft's tax liability. *See E.I. Du Pont de Nemours & Co.,* 675 A.2d at 89. Therefore, the court did not err in determining that the Board erred by concluding that Kraft was entitled to alternative apportionment.

B.     Substantial Understatement Penalty (First Assessment)

[¶34] Both parties take issue with the court's determination that Kraft is entitled to a partial abatement of the substantial understatement penalty imposed as part of the First Assessment. The Assessor argues that Kraft is not entitled to *any* abatement of the substantial understatement penalty, and Kraft argues that it is entitled to the *full* abatement awarded by the Board. The parties' dispute turns on the extent of any legal support for Kraft's earlier position—since abandoned—that KPC was not part of Kraft's unitary business and, for purposes of allocating income from the sale, that Kraft Foods Global Brands, Inc., was not part of Kraft's unitary business.

[¶35] Title 36 M.R.S. § 187-B(4-A) provides that "[t]here is a substantial understatement of tax if the amount of the understatement on the return or

returns for the period covered by the assessment exceeds 10% of the total tax required to be shown on the return or returns for that period." In the event of such an understatement, the taxpayer is subject to a penalty of up to $25 or twenty-five percent of the understatement, whichever is greater. 36 M.R.S. § 187-B(4-A). Any penalty resulting from a substantial understatement of taxable income must be abated, however, "if grounds constituting reasonable cause are established by the taxpayer." 36 M.R.S. § 187-B(7) (2020). Reasonable cause may be established where "[t]he taxpayer has supplied substantial authority justifying the failure to file or pay." 36 M.R.S. § 187-B(7)(F). Although "substantial authority" is not defined in Maine statutes, federal tax regulations define the "substantial authority" standard as

> an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the 'more likely than not' standard . . . but more stringent than the reasonable basis standard . . . . There is substantial authority for the tax treatment of an item only if the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment.

*John Swenson Granite, Inc. v. State Tax Assessor*, 685 A.2d 425, 429 n.3 (Me. 1996) (quoting Treas. Reg. § 1.6662-4(d)(2), (3) (1996)).

[¶36] Pursuant to federal regulations, only certain types of authority may be relied upon "for purposes of determining whether there is substantial

authority for the tax treatment of an item." Tres. Reg. § 1.6662-4(d)(3)(iii) (as amended in 2003). Examples include "provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statutes; [and] revenue rulings and revenue procedures." *Id.* We need not determine the weight to be given to those kinds of authority in cases involving Maine tax liability in this case because Kraft does not rely on any of those authorities.

[¶37] The federal regulations also recognize, however, that even in the "absence of certain types of authority," a taxpayer still may have substantial authority for the tax treatment of an item when its position "is supported only by a well-reasoned construction of the applicable statutory provision." Treas. Reg. § 1.6662-4(d)(3)(ii) (as amended in 2003); *see also Cohen v. United States*, 999 F. Supp. 2d 650, 676 (S.D.N.Y. 2014) (observing that this provision "contemplate[s] a situation where there are no authorities that specifically address the issue raised by the taxpayers' treatment of an item on their tax return"). The regulations provide little guidance on how to determine whether a proposed construction is sufficiently well-reasoned, but the substantial authority standard is "more stringent than the reasonable basis standard as defined in [Treas. Reg.] § 1.6662-3(b)(3)." Treas. Reg. § 1.6662-4(d)(2) (as

amended in 2003). "Reasonable basis is a relatively high standard of tax reporting" that is "significantly higher than not frivolous or not patently improper," and "is not satisfied by a return position that is merely arguable or that is merely a colorable claim." Treas. Reg. § 1.6662-3(b)(3) (as amended in 2003). "A position that is arguable, but fairly unlikely to prevail in court, does not satisfy the substantial authority standard." *Little v. C.I.R.*, 106 F.3d 1445, 1451 (9th Cir. 1997).

[¶38]  Kraft asserts that its position is supported by a well-reasoned construction of the statutory definition of "unitary business." *See* 36 M.R.S. § 5102(10-A) (2020). Section 5102 defines a unitary business as "a business activity which is characterized by unity of ownership, functional integration, centralization of management and economies of scale." Kraft argues that the terms used to define a unitary business are vague and that the unitary business analysis is inherently subjective and difficult to apply, thereby justifying its calculation of its 2010 tax liability. Kraft asserts, with respect to KPC, that when section 5102's definition of "unitary business" is applied to the stipulated facts, a reasonable person is entitled to find that KPC was not part of Kraft's unitary business. With respect to Kraft Foods Global Brands, Inc., Kraft frames its argument differently. Kraft argues that because there was substantial authority

for treating the income from the sale as income outside of the unitary business that was being taxed, the court erred in concluding that there was no substantial authority to support Kraft's position that the portion of the income from the sale that was paid to Kraft Foods Global Brands, Inc., was not taxable in Maine.

[¶39]  According to Kraft, "[t]he facts concerning substantial authority relate to the underlying pizza business," and it is "irrelevant to the analysis" which members of Kraft's unitary group received income from the sale.  Kraft then contends that each entity that received income from the sale should be treated the same for purposes of the substantial authority analysis because they are each members of Kraft's unitary group "and are therefore treated as a single business enterprise for Maine income tax purposes."  Kraft's argument jumps among assertions that there is substantial authority supporting a determination that (1) the individual corporate entities, KPC and Kraft Foods Global Brands, Inc., were not members of a unitary business; (2) the "pizza business" was not part of a unitary business; and (3) the sale income was "non-unitary income."  Kraft argues that this constitutes a well-reasoned construction of section 5102's definition of a unitary business sufficient to meet its burden of coming forward with substantial authority to support its position.

For the reasons discussed below, we disagree and conclude that Kraft is not entitled to any abatement of the penalty.

[¶40] The trial court determined that, "[o]n balance, there are more facts to support a conclusion that KPC is unitary with Kraft." The court found "that there is unity of ownership between Kraft and KPC and . . . that KPC benefitted from the economies of scale provided by its affiliation with Kraft." The court also determined that KPC was presumptively part of Kraft's unitary business because "KPC and the rest of Kraft's affiliated corporations are in the same general line or type of business: the prepared foods business." *See* 18-125 C.M.R. ch. 801, § .02 (2015).

[¶41] However, the trial court also found that "there are nonetheless some factors to support an objective determination that KPC's business lacked the functional integration and centralization of management characteristic of a unitary business." The court based this determination on its finding that "KPC provided important functions internally, such as manufacturing, marketing, and sales, KPC had separate manufacturing facilities, in-house marketing and sales teams, and a unique distribution and delivery model." The court also found that KPC "had its own consumer insights and new product development team, human resources department, executive management group, operations

team, and finance team." Finally, the court found that other Kraft affiliates primarily relied on Kraft Foods Global, Inc., for these functions. The court concluded that Kraft had met the "modest standard of proof . . . required for providing substantial authority for the proposition that KPC was not a member corporation of Kraft's affiliated group." The court noted, in effect, that this was a close call, however, given that it could not find that Kraft could show the existence of such authority by even a preponderance of the facts in the record. The court further concluded that Kraft *did not* provide substantial authority justifying its failure to include the portion of the income from the sale paid to Kraft Foods Global Brands, Inc.

[¶42] To reiterate, a unitary business is defined as "a business activity which is characterized by unity of ownership, functional integration, centralization of management and economies of scale."[10]     36 M.R.S.

---

[10]  The relevant Maine Revenue Services rule states:

> The activities of a taxpayer will be deemed to constitute a single business if those activities are integrated with, dependent upon and contributive to each other and to the operations of the taxpayer as a whole. The presence of any of the following factors creates a presumption that the activities of the taxpayer constitute a single trade or business: (1) All activities are in the same general line or type of business; [or] . . . (3) the taxpayer is characterized by strong centralized management including centralized departments for such functions as financing, purchasing, advertising and research.

18-125 C.M.R. ch. 801, § .02 (2015).

§ 5102(10-A); *see also MeadWestvaco Corp. v. Ill. Dep't of Revenue,* 553 U.S. 16, 30 (2008). We have recognized that, under the unitary business approach, if activities within and without the State "constitute one single integrated business enterprise, such that both in-state and out-of-state activities operate as a unit in the ultimate production of income, it is fair to include the income from out-of-state activities in apportionable income." *Gannett Co. v. State Tax Assessor*, 2008 ME 171, ¶ 12, 959 A.2d 741. In determining whether a business is truly unitary, we must "distinguish between entities that have significant operational connections and truly function as one business enterprise and those that have some connections but do not function as a unitary business." *Id.* ¶ 17 (citations omitted).

1.     Unity of Ownership & Economies of Scale

[¶43]  As the trial court concluded, the stipulated record plainly reflects unity of ownership. At the relevant time, both KPC and Kraft Foods Global Brands, Inc. were wholly owned by Kraft Foods Global, Inc., which itself was wholly owned by Kraft Foods Inc.

[¶44]  The trial court also correctly determined that KPC benefitted from economies of scale. "Economies of scale result when integrated businesses gain advantages from an umbrella of centralized management and controlled

interaction." *Gannett Co.*, 2008 ME 171, ¶ 18, 959 A.2d 741 (quotation marks omitted). Here, for example, Kraft used a "cash sweep" system, whereby excess cash held by KPC and every other Kraft affiliate was swept into a consolidated bank account. The money in this account was available to each Kraft affiliate. *See id.* ¶ 26 (observing that "such a system creates economies of scale and functional integration" and results in a flow of value). As we discuss in greater detail below, Kraft Foods Global, Inc. provided extensive centralized services to both KPC and Kraft Foods Global Brands, Inc., as well as other Kraft entities. *See id.* ¶¶ 20-21 (noting that "the provision of . . . centralized services creates economies of scale"). Therefore, these two elements of a unitary business are present.[11] *See* 36 M.R.S. § 5102(10-A). Kraft has not provided any substantial authority supporting the position that there was no unity of ownership or that it did not benefit from economies of scale.

2. Functional Integration & Centralization of Management

[¶45] With respect to the next factor, the court erred by determining that there is sufficient evidence in the stipulated record to "support an objective

---

[11] As the trial court also found, the facts trigger the regulatory presumption that Kraft's operations relevant here were unitary. *See id.*; *see supra* n.10.

determination that KPC's business lacked the functional integration and centralization of management characteristic of a unitary business."

[¶46] "Functional integration refers to transfers between, or pooling among, business segments that significantly affect the business operations of the segments." *Gannett Co.*, 2008 ME 171, ¶ 18, 959 A.2d 741 (citing *F.W. Woolworth Co. v. Taxation & Revenue Dep't*, 458 U.S. 354, 364-66 (1982) and *Exxon Corp. v. Dep't of Revenue*, 447 U.S. 207, 224-25 (1980)). "A system of interlocking directors and officers is evidence of a unitary business because of the centralized management and functional integration that results." *Gannett Co.*, 2008 ME 171, ¶ 25, 959 A.2d 741.

[¶47] Although not noted by the trial court, the joint stipulation of facts reveals a significant degree of overlap among the directors and officers of Kraft Foods Global, Inc., Kraft Foods Global Brands, Inc., and KPC. For example, in 2010, the same three individuals comprised the boards of directors of both KPC and Kraft Foods Global Brands, Inc. These three individuals were also officers of KPC and Kraft Foods Global, Inc., and two of them were officers of Kraft Foods Global Brands, Inc. Two of those individuals also held high-level management positions—Senior Vice President and Treasurer, and Senior Vice President, Legal and Corporate Affairs—in Kraft Foods Inc. At least seven other

individuals simultaneously served as officers of KPC, Kraft Foods Global Brands, Inc., and Kraft Foods Global, Inc., and four of those seven served in high-level management positions within Kraft Foods Inc.

[¶48] Further, "the provision of intercompany services that an independent business would ordinarily perform for itself, such as accounting, insurance, legal, tax, and financing, is a form of centralized management." *Id.* ¶ 21. The value resulting from these services is also evidence of functional integration. *Id.* Here, the joint stipulation of facts reveals that Kraft Foods Global, Inc., provided centralized services to both KPC and Kraft Foods Global Brands, Inc., including but not limited to manufacturing strategy and oversight, human resources, accounting, insurance, legal, tax, treasury, internal audit, payroll, and research and development services. *Cf. Id.* ¶¶ 20-21. These services were provided at cost, and the cost allocations were set by Kraft Foods Global, Inc., without negotiation. *See Container Corp.*, 463 U.S. at 180 n.19.

[¶49] In determining that there were "some factors" supporting a finding that KPC lacked functional integration or centralization of management, the trial court relied on the following stipulated facts: (1) KPC had separate manufacturing facilities; (2) KPC had in-house teams and departments providing some services, such as marketing, sales, product development,

human resources, executive management, operations, and finance; and (3) KPC had a unique distribution model. The court distinguished KPC from Kraft's other affiliates, finding that "many of Kraft's other affiliates relied on Kraft Foods Global, Inc. for these functions."

[¶50] Application of the statutory definition of "unitary business" to these facts does not constitute a well-reasoned construction sufficient to satisfy the substantial authority standard. The stipulated record shows that KPC relied on Kraft Foods Global, Inc., to provide several of the same services it provided in-house. For example, although manufacturing was one of the functions KPC provided internally, the stipulated facts show that Kraft Foods Global, Inc., "provided company-wide manufacturing strategy and oversight to KPC," and that KPC similarly relied on Kraft Foods Global, Inc., for other services that were provided internally, such as marketing, research, product development, and human resources. KPC's distribution model was also used by the Nabisco division during the relevant time and was not entirely unique to KPC. And, contrary to Kraft's contention that "KPC was unique among the Kraft affiliates in terms of its independence," the joint stipulation of facts reveals that several other entities related to Kraft, including Capri Sun, Inc., Churny Company, Inc., and Kraft Foods Ingredients Corp., operated at least as independently as KPC,

providing some services in-house while also relying on Kraft Foods Global, Inc. for centralized services, some of which overlapped with those provided in-house. The evidence in the stipulated record contradicts Kraft's claim that KPC "provided its own independent day-to-day management, relying on Kraft's management solely for administrative functions." And, even if KPC provided its own independent day-to-day management, that would not, on its own, constitute substantial authority that there was not "functional integration." *See Container Corp.*, 463 U.S. at 180 n.19.

[¶51] In addition, Kraft Foods Global, Inc., negotiated with third parties for the purchase of ingredients that KPC used to make its frozen pizza products and for the purchase of packaging materials that KPC used to package its products. Kraft Foods Global, Inc., also negotiated and entered into leases for trucks used by KPC to deliver its frozen pizzas. KPC shared certain facilities, including management center offices, depot warehouses, sales offices, and distribution centers, with Kraft Foods Inc. and its affiliates.

[¶52] Therefore, although KPC certainly maintained some degree of independence, the facts in the stipulated record are insufficient "to support an objective determination that KPC's business lacked the functional integration and centralization of management characteristic of a unitary business," given

the nature and breadth of the centralized services provided to both KPC and Kraft Foods Global Brands, Inc., by Kraft Foods Global, Inc., and the clear integration between these entities. Moreover, to the extent that Kraft asserts that the terms used in the definition of "unitary business" are vague, Kraft fails to discuss the Supreme Court's case law or our case law interpreting, clarifying, and applying those terms. *See, e.g., Container Corp.*, 463 U.S. at 180 n.19; *F.W. Woolworth Co.*, 458 U.S. at 364-72; *Exxon Corp.*, 447 U.S. at 224-25; *Gannett Co.*, 2008 ME 171, ¶¶ 11-27, 959 A.2d 741.

[¶53]    With respect to Kraft Foods Global Brands, Inc., Kraft acknowledges that that entity is, in fact, a member of the unitary group, but asserts that there is substantial authority for the position that the income from the sale was "nonunitary income." This argument is unavailing. Kraft points to no authority or well-reasoned statutory construction for its proposition that the income from the sale could properly be considered nonunitary income. In a footnote, Kraft attempts to draw a distinction between business and nonbusiness income; however, Maine has not recognized any such distinction for over thirty years, *see* P.L. 1987, ch. 841, § 11 (effective Aug. 4, 1988) (repealing subsection 3 of 36 M.R.S. § 5211, which provided for allocation of certain nonbusiness income). Moreover, we cannot accept Kraft's assertion,

made without citation to authority, that the income from the sale would have been treated as nonbusiness income in states that do recognize the distinction. Kraft Foods Global Brands, Inc., like KPC, was part of the unitary business; therefore, the income it received from the sale was business income chargeable to the unitary business. *See* 36 M.R.S. § 5211(8) ("*All income* shall be apportioned to this State by multiplying the income by the sales factor." (emphasis added)).

[¶54]   In sum, Kraft has not demonstrated that there is substantial authority supporting the position that KPC and Kraft Foods Global Brands, Inc., were not members of the unitary business with the rest of Kraft. The authority that Kraft has offered, in the form of a strained construction of the relevant statute, is far from "substantial," Treas. Reg. § 1.6662-4(d)(3)(i), in light of the overwhelming authority, and evidence in the stipulated record, contrary to Kraft's position. *See John Swenson Granite, Inc.*, 685 A.2d at 429 n.3.   We conclude that Kraft is not entitled to any abatement of the substantial understatement penalty levied as part of the First Assessment, and we vacate the portion of the court's judgment that concludes otherwise.

C.      The Second Assessment

[¶55]  Kraft's final argument is that the Second Assessment, imposed on May 3, 2017, approximately five and a half years after Kraft filed its 2010 corporate income tax return, is barred by the statute of limitations.  36 M.R.S. § 141(1) (2020).

[¶56]   Pursuant to 36 M.R.S. § 141(1), "[e]xcept as provided in subsection 2, an assessment may not be made after 3 years from the date the return was filed or 3 years from the date the return was required to be filed, whichever is later."  Title 36 M.R.S. § 141(2)(A) (2020) states, "An assessment may be made within 6 years from the date the return was filed if the tax liability shown on the return . . . is less than ½ of the tax liability determined by the assessor.  In determining whether the 50% threshold . . . is satisfied, the assessor may not consider any portion of the understated tax liability for which the taxpayer has substantial authority supporting its position."

[¶57]  The Second Assessment was timely.  Kraft's claimed tax liability on its 2010 return was $367,402.  The parties agree that Kraft's tax liability as determined by the Assessor was $2,392,567.  Kraft failed to provide substantial authority justifying its exclusion of the income from the sale, so the tax liability generated by that income is included in calculating whether the fifty percent

threshold was satisfied. *See id.* The tax liability shown on Kraft's 2010 return is less than half of the tax liability determined by the Assessor. Therefore, the six-year statute of limitations applied, and the Second Assessment levied prior to the expiration of that six-year period was not time-barred.

D.    Conclusion

[¶58]   To sum up, as to the First Assessment, we affirm the court's conclusion that Kraft was not entitled to an alternative apportionment of the income from the sale. *See* 36 M.R.S. § 5211(17). We vacate the court's partial abatement of the substantial underpayment penalty because Kraft is not entitled to any abatement. On remand, we instruct the court to affirm the full substantial understatement penalty levied by the Assessor. As to the Second Assessment, we affirm the court's determination that it was not barred by the statute of limitations.

The entry is:

> The partial abatement of the substantial underpayment penalty on the First Assessment is vacated. The matter is remanded to the Business and Consumer Docket to affirm the full penalty imposed by the Assessor. The judgment is affirmed in all other respects.

Jonathan A. Block, Esq. (orally), Pierce Atwood LLP, Portland, for appellants Kraft Foods Group, Inc., Kraft Foods Global, Inc., Kraft Pizza Company, and Cadbury Adams USA LLC

Aaron M. Frey, Attorney General, and Thomas A. Knowlton, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State Tax Assessor

Business and Consumer Docket docket numbers AP-2016-02 and AP-2017-09
FOR CLERK REFERENCE ONLY