MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2021 ME 8
Docket:       BCD-20-112
Argued:       November 17, 2020
Decided:      February 18, 2021

Panel:        MEAD, GORMAN, JABAR, HORTON, and CONNORS, JJ.

APPLE INC.

v.

STATE TAX ASSESSOR

HORTON, J.

[¶1]  The State Tax Assessor appeals from a summary judgment entered in the Business and Consumer Docket (*Murphy, J.*), concluding that the taxable "sale price" of iPhones sold at discounted prices to customers who entered into wireless service contracts at Apple Inc.'s retail stores did not include payments made by the wireless service carriers to Apple in connection with the sales.  The court concluded that the carriers' payments to Apple were not sufficiently linked to the purchases of the phones to constitute reimbursement for the discounts.  The Assessor also appeals the court's order sealing portions of the parties' filings.

[¶2]  We agree with the Assessor that amounts paid by the carriers to Apple constitute part of the taxable sale prices for the phones because Apple

expected at the time of sale that it would be reimbursed by the carriers for the price discounts granted to customers who entered into wireless service contracts with the carriers. We therefore vacate the grant of summary judgment and remand for entry of judgment in favor of the Assessor. However, we affirm the order sealing portions of the parties' M.R. Civ. P. 56 filings.

## I. BACKGROUND

[¶3] The following recitation of facts is based on the parties' stipulation of facts and the additional undisputed facts in the summary judgment record. *See State Tax Assessor v. Kraft Foods Grp., Inc.*, 2020 ME 81, ¶¶ 2, 13, 235 A.3d 837.

[¶4] The State Tax Assessor is the executive responsible for enforcing the state tax laws through Maine Revenue Services (MRS). Apple is a manufacturer and retailer of electronic equipment, including handheld wireless telephones marketed as iPhones. Apple operates online stores and brick-and-mortar retail stores, collectively called Apple Direct Channels, where iPhones are available for purchase by retail customers.

[¶5] This case involves payments made to Apple pursuant to a series of contracts between Apple and three wireless telecommunications carriers during a roughly three-year period. The three carriers are AT&T Mobility, LLC

(AT&T), Cellco Partnership d/b/a Verizon Wireless (Verizon), and Sprint/United Management Company (Sprint). All of the contracts called for the carriers to make payments to Apple. A payment was triggered by the purchase of an iPhone at an Apple Direct Channel by a retail customer who also entered into a wireless service contract with one of the three carriers. In nearly every sale at issue, the wireless service contract was for a two-year period. For example, a retail customer could buy for $199 an iPhone regularly priced at $649 if the customer agreed to enter into a wireless service contract with AT&T, Sprint, or Verizon. Apple collected and remitted to MRS sales tax on the reduced price charged to the customer for the phone—$199 in that example—rather than on the regular price of the iPhone. In contrast, a retail customer who purchased the same phone without also entering into a wireless service contract was charged the regular price of $649, and Apple collected and remitted sales tax based on the regular price.

[¶6] In May 2013, MRS commenced a "sales and use tax" and "service provider tax" audit of Apple. The audit period covered May 1, 2010, to April 30, 2013. As a result of the audit, the Assessor determined that, throughout the audit period, Apple had not properly collected and remitted sales tax due on sales of iPhones in Apple Direct Channels in Maine when Apple

4

sold iPhones at reduced prices to retail customers who agreed to enter into wireless service contracts with the carriers. The Assessor concluded that the tax on these transactions should have been collected and remitted based on the regular price of the iPhones rather than the reduced price actually charged because Apple expected full reimbursement by the carrier for the difference between the regular price of the iPhones and the reduced price actually charged to the customers.

[¶7] On October 17, 2014, MRS issued a notice of assessment for the difference between what Apple actually collected and remitted in sales tax during the audit period and what the Assessor determined should have been collected and remitted. It asserted that Apple owed $437,896.32 in tax and $101,342.05 in interest. The total amount owed was $539,238.37.

[¶8] Apple requested reconsideration of the assessment pursuant to 36 M.R.S. § 151(1) (2020). On July 29, 2016, MRS issued its decision on reconsideration, upholding the assessment in full. That September, Apple appealed the assessment to the Board of Tax Appeals pursuant to 36 M.R.S. § 151-D(10) (2020). The Board issued a decision upholding the assessment. Apple requested that the Board reconsider its decision and submitted additional information in support of its position. After further review, the

Board found no error in the decision and upheld it without alteration in an order dated December 12, 2017, pursuant to 18-674 C.M.R. ch. 100 § 305(B) (2020).

[¶9]  On February 8, 2018, Apple petitioned for judicial review of the agency action in the Superior Court (Kennebec County), pursuant to 5 M.R.S. §§ 11001(1) and 11002 (2020); 36 M.R.S. § 151; and M.R. Civ. P. 80C.  The case was transferred to the Business and Consumer Docket on March 22, 2018.  Apple filed its motion for summary judgment, *see* M.R. Civ. P. 56(a), on September 16, 2019.  The Assessor filed its own motion for summary judgment, *see* M.R. Civ. P. 56(b), on October 29, 2019.

[¶10]  While the case was pending, the court entered a confidentiality order at Apple's request prescribing procedures for protecting confidential material from disclosure in the public record.  *See* M.R. Civ. P. 79(b)(1).  Apple asked the court to seal a considerable quantity of the material filed with the Assessor and the Board and of the material filed in connection with the parties' motions for summary judgment.  The court requested that the parties confer on Apple's request, but the parties were unable to reach complete agreement.  Following the dispute resolution procedures contained in the confidentiality

order, the court issued an order broadly sealing references to the carrier contract provisions from the public record.

[¶11]  After holding a hearing on the pending motions, on March 10, 2020, the court issued an order granting Apple's motion for summary judgment and denying the Assessor's motion.  The Assessor timely appeals from the judgment and also appeals from the court's order sealing the parties' filings, arguing that it is overbroad.[1]  *See* 14 M.R.S. § 1851 (2020); 5 M.R.S. § 11008 (2020); M.R. App. P. 2B(c)(1).  The Assessor asks us to vacate the judgment and the order sealing filings and to remand for the court to enter judgment in the Assessor's favor and to unseal at least some portions of the filings.  Apple asks us to affirm both the judgment and the order sealing filings.

## II.  DISCUSSION

[¶12]  We begin with the Assessor's appeal of the court's entry of summary judgment in favor of Apple.  The issue involves statutory interpretation, which we review de novo as a question of law, *see Irving Pulp & Paper, Ltd. v. State Tax Assessor*, 2005 ME 96, ¶ 8, 879 A.2d 15, and the application of law to undisputed facts.

---

[1]  On August 24, 2020, the Council on State Taxation and the Maine State Chamber of Commerce filed a joint amicus brief.  Amici's brief spoke only to Issue 2, proffering that taxpayers have an expectation of privacy and that the court was correct to seal Apple's confidential tax information.

[¶13] The parties presented a stipulation to certain facts, and many other assertions of fact are extensively set forth in the parties' statements of material fact. Although it would have been desirable for the parties to have presented the case on a fully stipulated record, neither party asserts that there are any disputed material facts nor additional material facts that are not set forth in the record, although they disagree on how certain undisputed facts should be interpreted. Neither party contends that the trial court should not have entered summary judgment based on the record presented, although they disagree as to which party was entitled to judgment. Given that the material facts are not in dispute, "[t]he propriety of the court's entry of summary judgment . . . turns on whether, as a matter of law, [payments made to the retailer] fall within the definition of 'sale price'" pursuant to 36 M.R.S. § 1752(14). *Flik Int'l Corp. v. State Tax Assessor*, 2002 ME 176, ¶ 9, 812 A.2d 974.

A.     Sales Tax

[¶14] Because the trial court's review of the Tax Board's decision was de novo, *see* 36 M.R.S. § 151-D(10), we review the trial court's interpretation of the applicable statutes directly, without deference to the Board's legal determinations. *See Warnquist v. State Tax Assessor*, 2019 ME 19, ¶ 12, 201 A.3d 602.

8

1.      Statutory and Precedential Framework

[¶15]   By statute, sales tax "is imposed on the value of all tangible personal property . . . sold at retail in this State."  36 M.R.S. § 1811 (2013).[2] "Value is measured by the sale price" of the property sold.  *Id.*  "Sale price" is defined as "the total amount of a retail sale valued in money, whether received in money or otherwise."  36 M.R.S. § 1752(14) (2020).[3]  "Sale price" includes

> **(1)**  Any consideration for services that are a part of a retail sale; [and]
>
> **(2)**  All receipts, cash, credits and property of any kind or nature and any amount for which credit is allowed by the seller to the purchaser, without any deduction on account of the cost of the property sold, the cost of the materials used, labor or service cost, interest paid, losses or any other expenses.

36 M.R.S. § 1752(14)(A)(1)-(2).

[¶16]   The definition of "sale price" "sweeps broadly so that any value received for a retail sale is included."  *Flippo v. L.L. Bean, Inc.*, 2006 ME 62, ¶ 10, 898 A.2d 942.  Payments made to a retailer in connection with a particular sale count toward the sale price even "if they come from two different sources, if

---

[2]  Since 2013, 36 M.R.S. § 1811 has been amended multiple times but not in ways that affect this analysis.  *See* P.L. 2017, ch. 409, § D-2 (effective Aug. 1, 2017).

[3]  The statutory definition of "sale price" was amended in 2019 but not in any respect material to the analysis.  *See* P.L. 2019, ch. 401, § B-5 (effective Sept. 19, 2019).  The citation is to the current version of the definition.

they are paid at two different times, or if they are not itemized to correspond to a particular item sold." *Flik*, 2002 ME 176, ¶ 19, 812 A.2d 974.

[¶17] The definition of "sale price" does not include "discounts allowed and taken on sales." 36 M.R.S. § 1752(14)(B)(1). However, if at the time of sale the retailer expects to be reimbursed for what may appear to be a price discount, the amount of the expected reimbursement becomes part of the taxable sale price. *See Flippo*, 2006 ME 62, ¶ 17, 898 A.2d 942.

[¶18] "[I]n a case where the facts are not in dispute, the burden is on the taxpayer, at all stages of the proceeding, to establish that the transaction is not taxable." *Flik*, 2002 ME 176, ¶ 13, 812 A.2d 974 (citing 36 M.R.S. § 151). Accordingly, Apple has the burden to demonstrate that the price reductions that it granted on iPhones purchased by customers who also bought wireless plans were true nontaxable discounts. *See id.* Apple must also show that the payments that it received from carriers in connection with such sales should not be treated as "value" to be counted in determining the sale price of the iPhones. *See id.* Our decisions in *Flik* and *Flippo* offer useful guidance in our determination of whether Apple has met its burden.

[¶19] In *Flik*, the issue was whether payments made by MBNA America Bank, N.A., to Flik International Corp., which operated employee cafeterias at

three of MBNA's corporate facilities, should be counted toward the sale price of the cafeteria food. 2002 ME 176, ¶¶ 1-3, 812 A.2d 974. MBNA required Flik to sell the cafeteria food at below-market prices and to operate the cafeteria for longer hours at a higher staffing level than would be the case at a "typical restaurant," resulting in Flik's operating costs for the cafeterias exceeding its proceeds from cafeteria sales. *Id.* ¶¶ 3-4. However, MBNA also made "contract payments" to Flik, covering the "costs of acquiring, preparing and selling food in MBNA's cafeterias, plus a guaranteed profit, plus an overhead charge, less the gross proceeds from Flik's sales to cafeteria patrons." *Id.* ¶ 5. "MBNA never directly reimbursed Flik for any portion of the stated sale price of any food item sold to cafeteria patrons." *Id.*

[¶20] Flik remitted sales tax on the amounts paid by cafeteria patrons for food but did not remit sales tax on any of the "contract payments" it received from MBNA. *Id.* ¶¶ 3, 5. After an audit, the Assessor made an assessment of sales tax against the payments Flik had received from MBNA based on the Assessor's determination that the payments counted toward the sale price of the cafeteria food. *Id.* ¶ 6.

[¶21] On appeal, Flik contended that MBNA's payments were not tied to sales of food and instead were made under a service contract intended to

compensate Flik for managing and operating the cafeterias. *Id.* ¶ 17. The Superior Court agreed with Flik and vacated the assessment. *Id.* ¶ 7. On the Assessor's appeal, we vacated the Superior Court's grant of summary judgment and remanded for entry of judgment in the Assessor's favor, noting that "Flik would not have agreed to charge the low prices but for MBNA's agreement to reimburse Flik for costs that Flik did not recover from the revenues derived from sales to cafeteria patrons." *Id.* ¶ 3.

[¶22] Even though MBNA's payments were not characterized as subsidies or reimbursements, came from a different source than the retail purchasers of the food, were not made at the time of the retail purchases, and did not correlate to specific retail food purchases, we decided that the payments still constituted a portion of the sale price of the food and were therefore subject to sales tax. *Id.* ¶¶ 19-21.

[¶23] In *Flippo v. L.L. Bean, Inc.*, we addressed a sale price issue involving L.L. Bean merchandise and MBNA credit card accounts. 2006 ME 62, ¶ 2, 898 A.2d 942. MBNA and L.L. Bean entered into an agreement under which MBNA issued "affinity" L.L. Bean VISA credit cards to L.L. Bean retail customers. *Id.* MBNA agreed to pay L.L. Bean royalties based on the number of such accounts opened and the amounts charged on those accounts. *Id.*

[¶24]  To induce L.L. Bean customers to apply for the affinity VISA accounts with MBNA, the agreement called for L.L. Bean to give "inducement coupons" to retail customers who applied for L.L. Bean VISA accounts.  *Id.* ¶ 3. The customers could use the coupons to purchase L.L. Bean merchandise for less than the regular price charged for the same merchandise.  *Id.* ¶ 2.  When a customer used a coupon in making a purchase, L.L. Bean collected sales tax based on the regular price for the merchandise rather than the reduced price. *Id.*  MBNA paid L.L. Bean royalties as reimbursement for the value of the coupons and additional royalties for new VISA accounts opened through this marketing effort.  *Id.*

[¶25]  The *Flippo* plaintiffs were members of a class consisting of persons who had purchased L.L. Bean merchandise using MBNA's inducement coupons. *Id.* ¶¶ 4, 6.  Their claim was that L.L. Bean should have collected sales tax based on the reduced prices for its merchandise rather than on the regular prices, and they sought recovery for the class measured by the difference.  *Id.* ¶ 6.  Thus, the fundamental issue was whether the reduction in sale price associated with the coupon was a nontaxable discount, as the plaintiff class contended, or was taxable because MBNA's royalty payments counted toward the sale price of the merchandise.  *Id.* ¶ 10.  We pointed out that "[t]he MBNA contract payments at

issue in *Flik* were more closely tied to sales than the MBNA royalty payments [to L.L. Bean] because the contract payments were calculated by a formula that considered Flik's monthly cafeteria sales, while the royalty formula does not consider the amount of coupons redeemed in any particular period." *Id.* ¶ 13 (citations omitted).

[¶26] Still, we concluded that, based on the undisputed facts, "the value of the coupons is not an unreimbursed discount, but is part of the sale price." *Id.* ¶ 14. Key to our conclusion was the undisputed fact that L.L. Bean reduced its retail prices by the value of the inducement coupons expecting to be reimbursed by MBNA for the reduction. *Id.* ¶ 15. It was the expectation of reimbursement at the time of sale that conclusively established that the price reduction granted was not a nontaxable discount. *See id.* ¶ 17. It is that consideration that guides our analysis of the Apple service contracts.

2.      The Carriers' Payments to Apple

[¶27] The Assessor contends that payments made by the carriers to Apple for sales made at Apple Direct Channels were meant to reimburse Apple for the price reductions on iPhones granted to customers who agreed to enter into wireless service contracts with the carriers at the point of purchase. Thus,

14

the Assessor argues, the payments were a part of the taxable sale price on which sales tax should have been collected and remitted.

[¶28]  Apple counters that those payments were "bounties" that the carriers paid to Apple for finding them new customers rather than reimbursements for iPhone price reductions.  It claims that the contracts with the carriers unambiguously establish that Apple and the carriers intended the payments to constitute rewards given to Apple for the economic benefit to the carriers in gaining new wireless contracts.  Apple contends that, because the payments made were bounties, the price reductions constituted true discounts that would not count toward the taxable sale price.  *See* 36 M.R.S. § 1752(14)(B)(1).  Apple also submitted affidavits and other evidence indicating that its intent and that of the carriers was that the payments be bounties rather than reimbursements to Apple for the iPhone discounts granted to retail customers.

[¶29]  The ultimate question presented is whether, at the time of sale, Apple expected to receive reimbursement for the price reduction on an iPhone that it granted to a customer who also agreed to enter into one of the wireless service contracts covered by Apple's contracts with the carriers.  *See Flippo*, 2006 ME 62, ¶ 11, 898 A.2d 942 ("[I]f the retailer expects reimbursement, and

thus does not foresee a reduction in profits, there is no discount regardless of the particular form that the reimbursement will take."). This analytical framework is consistent with how other jurisdictions characterize similar transactions in the sales tax context. *See, e.g.*, *Home & Garden Party, Inc. v. Comm'r of Revenue*, No. 7924-R, 2008 Minn. Tax LEXIS, at *7-*9 (Minn. Tax Ct. Nov. 24, 2008) (concluding that "sales tax is based upon the retail selling price of [the] products because the [benefits paid as reimbursements for the discounted sale price] were part of the gross receipts paid for [the retailer's] products"); *Grogan v. N.M. Tax'n & Revenue Dep't*, 62 P.3d 1236, 1241 (N.M. 2003) ("A retailer who is reimbursed the discounted amount does not absorb the cash loss. Such a retailer is in no position to claim a[ tax] exclusion."); *cf. Saxon-Western Corp. v. Mahin*, 411 N.E.2d 242, 245 (Ill. 1980) (concluding that discount coupons distributed by the retailer-taxpayer were not taxable as part of the taxpayer's gross receipts because the taxpayer never received reimbursement from any source for the discount granted when honoring the coupon).

[¶30] The fundamental issue before us distills to whether Apple reduced iPhone prices with the expectation of recouping its profit through payments from the carriers. Therefore, whether Apple's contracts with the carriers are

ambiguous or not, what Apple and the carriers may have thought or intended the payments to be, and what labels the contracts placed on the carriers' payments to Apple are relevant but not determinative. *See Flippo*, 2006 ME 62, ¶ 11, 898 A.2d 942. The parol evidence rule regarding contract interpretation "cannot prevent a court from inquiring into the facts in order to determine the actual sale price for tax purposes." *Id.* ¶ 14 n.2. For the same reason, the purpose of the carriers' payments to Apple may be gleaned from the parties' course of performance as well as from the contract terminology, *see A. E. Robinson Oil Co. v. Cty. Forest Prod.*, 2012 ME 29, ¶ 9, 40 A.3d 20.

[¶31] In fact, the terminology in most of Apple's contracts with the carriers describing certain payments to Apple supports the Assessor's position. These contracts provide for the carriers to "reimburse" Apple with "subsidies" keyed to the amount of the price reduction on iPhones granted to customers who also entered into the carriers' wireless contracts at Apple Direct Channels. Apple's contracts with all three carriers during most of the audit period required the carriers to pay Apple what the contracts call the "iPhone Handset Subsidy." The contracts set the amount of each "Subsidy" payment at the difference between the regular price of the iPhone and the reduced price charged to a customer who purchased one of the wireless service plans covered

by the carriers' contracts with Apple. Moreover, the contracts stated that the carriers were to "promptly reimburse" Apple with the "Subsidy" payments.

[¶32] Apple contends that the use of the term "reimburse" should be disregarded because the payments were due only when customers activated wireless service contracts and therefore were "bounties" to reward Apple for finding new customers for the carriers. But the reimbursement label that the contracts use to describe the payments cannot be ignored, and the record does not show that Apple incurred any expense or cost for which it could be "reimbursed" except the price reductions on its iPhones.

[¶33] Although not all of the contracts used "reimburse" or other terminology so favorable to the Assessor's position, they all called for payments from the carriers triggered by Apple's retail sales of iPhones at reduced prices. Apple clearly expected to be reimbursed for the iPhone price reductions it granted to customers who entered into wireless service contracts that qualified for reimbursement by the carriers. The price reductions, the carriers' payments, and the length of the wireless contracts were all directly related. The longer the term of the wireless service plan a customer agreed to purchase, the greater the price reduction on the phone and the larger the carrier's payment to Apple. Thus, there was direct linkage between the subsidies that Apple

granted to its customers on iPhone prices and all three carriers' payments to Apple. *See Flik*, 2002 ME 176, ¶¶ 19, 21, 812 A.2d 974.

[¶34] On the other hand, not all of the carriers' payments to Apple were reimbursement for the price reductions. Some payments were tied to the duration of the wireless service contracts rather than to price reductions on iPhones, and the Assessor does not contend that these commissions should be included in the calculation of the iPhones' taxable sale prices.

[¶35] Perhaps the most compelling evidence that Apple always intended and expected to realize its regular price for the iPhones sold at reduced prices to customers who also purchased wireless service plans is the fact that it did not grant the same price reductions to customers who purchased iPhones but did not enter into wireless service contracts. A retailer who grants a price reduction to customers who also purchase a product from a third party but does not grant a similar price reduction to other customers who purchase the same product at the same time without purchasing the third party's product may have difficulty proving that payments it receives from the third party are not reimbursements for the price reduction. *See Flik*, 2002 ME 176, ¶ 17, 812 A.2d 974.

[¶36]  In arguing that the payments were "bounties," Apple points out that the carriers' payments were subject to delay and were conditioned on the customers' activation of wireless service contracts with the carriers.  We rejected a similar argument in *Flippo*.  In *Flippo*, MBNA paid L.L. Bean for accepting an inducement coupon if the customer who redeemed the coupon opened a credit card account with MBNA.  2006 ME 62, ¶¶ 2-3, 898 A.2d 942.  The plaintiff class argued that L.L. Bean was entitled to collect sales tax in the amount of the inducement coupons only if MBNA actually reimbursed L.L. Bean for accepting the coupons.  *Id.* ¶ 15.  We noted that "there is no requirement in the statutes for examining actual reimbursement" because it is the retailer's expectation at the time of sale that controls.  *Id.* ¶ 16.

> Because the tax is due, and must be calculated at the time of sale, the expectation of the retailer that there will be third-party reimbursement for part of the sale price must also be judged at the time of the sale.  The failure to receive expected reimbursement within a certain period does not retroactively decrease the sales tax liability and entitle the purchaser to a refund of the difference.

*Id.*  This principle is directly translatable to the transactions at issue here.

[¶37]  Apple also points to the Maine Revenue Services Instructional Bulletin's provision noting that a customer who enters into a wireless service contract and purchases an iPhone at a retail outlet operated by a wireless carrier typically pays no sales tax on the iPhone because its price is considered

part of the purchase price of the wireless service, which is subject to service provider tax, *see* 36 M.R.S. §§ 2551-2560 (2020), rather than sales tax. Apple argues that it is illogical for its own retail customers who purchase iPhones and enter into wireless service contracts to be required to pay sales tax on the regular prices of the iPhones when they would pay no sales tax on the iPhones if they made the purchase at the carriers' retail outlets. But, as the Assessor points out, the two types of transactions are fundamentally different. Apple's retail customers make two purchases from two different sellers—they purchase tangible personal property from Apple and purchase a service from a wireless carrier—whereas the carriers' retail customers make a single "bundled" purchase of a service with the phone included at no extra cost in the transaction. Also, as the Assessor points out, when the carrier provides a free phone to a customer entering into a wireless contract, the carrier is extending a true, nontaxable discount because it does not expect payment for the phone from either the customer or any third party. *See Flippo*, 2006 ME 62, ¶ 11, 898 A.2d 942.

[¶38] The undisputed facts make it clear that the carriers' payments to Apple functioned, in part, as reimbursement to Apple for the iPhone price reductions granted to customers who entered into wireless service contracts

with carriers. Accordingly, the price reductions that Apple granted to customers who purchased iPhones and entered into wireless service contracts were not true, nontaxable discounts within the meaning of the statute, *see* 36 M.R.S. § 1752(14)(B)(1), and the assessment of sales tax based on the regular retail prices of the iPhones was valid.

B.     Record Sealing and Public Access to Court Files

[¶39]  The Assessor contends that the court's order granting Apple's request to seal portions of the parties' court filings was overbroad. The Assessor objects specifically because the effect of the order was to seal verbatim quotes from Apple's contracts with carriers and to redact from the public record references to the amounts of payments made under the contracts, despite the fact that all of the contracts have long since expired. Apple cites to the continued need for confidentiality because it maintains contractual relationships with the same carriers, and current contracts are built upon previous ones.[4]

---

[4] The tax statute that extends confidentiality protection to information and documentary material provided by a taxpayer to the Assessor in connection with an audit does not compel the sealing of such information and material if filed in court. *See* 36 M.R.S. § 191 (2020) ("Except as otherwise provided by law, it is unlawful for any person who, pursuant to this Title, has been permitted to receive or view any portion of the original or a copy of any report, return or other information provided pursuant to this Title to divulge or make known in any manner any information set forth in any of those documents or obtained from examination or inspection under this Title of the premises or property of any taxpayer."). The statute acknowledges the presumptively public nature of court filings by specifically permitting such material to be filed in court if "pertinent to the action or

22

[¶40]  A trial court's decision to seal records is reviewed for an abuse of discretion. *See Bailey v. Sears, Roebuck & Co.*, 651 A.2d 840, 844 (Me. 1994). "An abuse of discretion may be found where an appellant demonstrates that the decisionmaker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567.

[¶41]  Here, the court's confidentiality order was entered by agreement of the parties.  The order permitted Apple to designate documents and information as confidential and established a procedure for resolving disputes about the confidentiality of particular documents and information.  The court followed the procedure in determining what information and documents should be sealed.  The court's sealing order indicates that it was satisfied that the material deserved the protection afforded by the order.  Although the court's sealing order is indeed very broad, we cannot say that it reflected an abuse of discretion. *See Bailey*, 651 A.2d at 844.

[¶42]  Accordingly, as to this issue, the court's order is affirmed.

---

proceeding," 36 M.R.S. § 191(2)(C).  As with any other material filed with the court, the proponent of sealing such material has the burden to justify the request through a showing of need for confidentiality, typically through affidavits if the sealing request is opposed by another party or questioned by the court.

The entry is:

> Judgment in favor of Apple vacated. Remanded for entry of summary judgment affirming the decision of the Maine Board of Tax Appeals in favor of the Assessor. Order sealing records is affirmed.

---

Aaron M. Frey, Attorney General, Thomas A. Knowlton, Asst. Atty. Gen. (orally), and Kimberly L. Patwardhan, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellant State Tax Assessor

George S. Isaacson, Esq. (orally), Nathaniel A. Bessey, Esq., and David W. Bertoni, Esq., Brann & Isaacson, Lewiston, for appellee Apple Inc.

Bernard J. Kubetz, Esq., Eaton Peabody, Bangor, for amici curiae Council on State Taxation and Maine State Chamber of Commerce

Business and Consumer Docket docket number AP-2018-1
FOR COURT REFERENCE ONLY