MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:    2022 ME 36
Docket:      BCD-21-135
Argued:      December 8, 2021
Decided:     June 23, 2022

Panel:       STANFILL, C.J., and MEAD, JABAR, HORTON, and CONNORS, JJ.*

STATE TAX ASSESSOR

v.

TRACFONE WIRELESS, INC.

JABAR, J.

[¶1]  TracFone Wireless, Inc., appeals from a summary judgment granted in favor of the Maine Tax Assessor entered in the Business and Consumer Docket (*Murphy, J.*) concluding that TracFone's Lifeline service was subject to the state's prepaid wireless fee and service provider tax.  TracFone also appeals from the trial court's denial of a motion to compel the production of documents related to taxpayers similarly situated to TracFone.

[¶2]   Because we disagree that the Lifeline service was "paid for in advance," 25 M.R.S. § 2921(13) (2022), 35-A M.R.S. § 7102(4) (2022), we vacate the court's summary judgment as to the prepaid wireless fee.  However,

---

* Although Justice Gorman and Justice Humphrey participated in the appeal, both retired before this opinion was certified.

because TracFone sold its Lifeline service under 36 M.R.S. § 2552 (2022), we affirm the court's grant of summary judgment as to the service provider tax. Finally, we affirm the order denying TracFone's motion to compel the production of documents.

## I. BACKGROUND

[¶3]  The following is based on the parties' stipulation of the facts and the additional undisputed facts in the summary judgment record.  *See Apple Inc. v. State Tax Assessor*, 2021 ME 8, ¶ 3, 254 A.3d 405.

[¶4]  TracFone sells telecommunications services and has operated in Maine since 1998.  At all relevant times, TracFone did not own or operate its own telecommunications facilities but instead purchased the services from other licensed wireless network operators.  It provided prepaid minutes for use by its customers on a "declining-balance basis," where TracFone would supply a set number of minutes that declined as the consumer used the service for calls, voicemail, texts, and directory and operator assistance.

[¶5]  In 2005, the Federal Communications Commission granted TracFone a forbearance that allowed it to become an eligible telecommunications provider (ETC) for the Lifeline program.  Lifeline is a program designed to provide universal access to telecommunications services,

specifically to qualifying low-income consumers. The FCC created the Universal Service Fund to pay for Lifeline, and the Universal Service Administrative Company (USAC) administers the program and the Universal Service Fund. To be eligible, ETCs must certify that they would pass through the full amount of the subsidy—$9.25 a month per consumer for the relevant time period—to "qualifying low-income consumer[s] and that [the ETC] has received any non-federal regulatory approvals necessary to implement the rate reduction." 47 C.F.R. § 54.403(a)(1) (2020).

[¶6]  In February 2010, the Public Utilities Commission granted TracFone's application to operate as a Lifeline-only ETC in Maine, and TracFone began offering the service, known as SafeLink Wireless, in March 2010. The program supplied to consumers each month a set number of minutes that subscribers could use on a declining-balance basis. Unused minutes were rolled over to the next month's balance. TracFone never charged Lifeline subscribers more than the subsidy it received from USAC. By the end of 2015, TracFone had 17,000 Lifeline subscribers in Maine.

[¶7]  In April 2014, the Maine Revenue Service initiated an audit of TracFone covering the period from December 1, 2012, to January 31, 2016. During the audit period, TracFone did not pay any taxes or fees to the Maine

4

Revenue Service or the PUC on the subsidy it received from USAC. On July 28, 2016, the Assessor issued a notice of assessment and determined that TracFone should have been paying a service provider tax and a prepaid wireless fee.[1] Based on the $9.25 subsidy per subscriber per month, the Assessor assessed a prepaid wireless fee of $1,208,459.42 and service provider tax of $439,333.25 for the audit period.

[¶8] On September 26, 2016, TracFone requested reconsideration of the assessments of the service provider tax and prepaid wireless fee. The Assessor upheld its original assessment. On May 22, 2017, TracFone filed a statement of appeal with the Board of Tax Appeals, which, on April 21, 2018, upheld the assessment of the prepaid wireless fee but determined that Lifeline was a "prepaid calling service" subject to the sales tax and not the service provider tax. The Board of Tax Appeals denied TracFone's subsequent request for reconsideration.

[¶9] Both the State Tax Assessor and TracFone then petitioned for review in the Superior Court (Kennebec County, *Stokes*, *J.*), which recommended transfer to the Business and Consumer Docket. The Business

---

[1] In 2018, after the audit period, the legislature passed a bill exempting USAC-subsidized services from certain fees, including the service provider tax. *See* P.L. 2017, ch. 422. The law's stated effective date was January 1, 2019. *Id.* § 12.

and Consumer Docket (*Murphy, J.*) accepted the transfer. During discovery, on February 3, 2020, the court denied TracFone's motion to compel the release of information about taxpayers that TracFone asserted were similarly situated to it. Following the close of discovery, both parties moved for summary judgment. On April 7, 2021, the court granted the Assessor's motion for summary judgment and held that the Lifeline service was subject to the service provider tax and the prepaid wireless fee. TracFone timely appealed. *See* 14 M.R.S. § 1851 (2022); M.R. App. P. 2A, 2B(c)(1).

## II. DISCUSSION

[¶10] On appeal, TracFone contends that the court erred in granting a summary judgment in favor of the Assessor and determining that TracFone was subject to both the prepaid wireless fee and the service provider tax. Additionally, TracFone argues that the court erred in denying its discovery motion to compel the Assessor to release records to establish the Assessor's policy, practice, or interpretation prior to the audit period.

### A. Motion for Summary Judgment

#### 1. Standard of Review

[¶11] In reviewing a motion for summary judgment "[w]e review de novo whether there was no genuine issue of material fact and whether either

party was entitled to judgment as a matter of law." *Warnquist v. State Tax Assessor*, 2019 ME 19, ¶ 12, 201 A.3d 602.  We also review de novo issues of statutory interpretation.  *Apple Inc.*, 2021 ME 8, ¶ 12, 254 A.3d 405.  Because the trial court's review of the Board of Tax Appeals' decision was de novo, *see* 36 M.R.S. § 151-D(10)(I) (2022), we review the trial court's interpretation without deference to the Board's legal determinations.  *See Warnquist*, 2019 ME 19, ¶ 12, 201 A.3d 602.  On appeal to the Superior Court, "[t]he burden of proof is on the taxpayer."  36 M.R.S. § 151-D(10)(I).

[¶12]  In interpreting a statute, we first look to the "plain meaning of the statutory language to give effect to the Legislature's intent," and only if the statute is ambiguous will we "look beyond that language to examine other indicia of legislative intent, such as legislative history."  *Wuori v. Otis*, 2020 ME 27, ¶¶ 6-7, 226 A.3d 771 (quotation marks omitted).  However, we construe taxation statutes "most strongly against the government and in the [taxpayer's] favor, and we will not extend [a taxation statute's] reach beyond the clear import of the language used."  *Goggin v. State Tax Assessor*, 2018 ME 111, ¶ 13, 191 A.3d 341 (first alteration in original) (quotation marks omitted).

### 2.	Prepaid Wireless Fee

[¶13]  The Legislature enacted the prepaid wireless fee as an alternative method of taxing any prepaid wireless provider who lacks a regular monthly billing cycle and whose telecommunications service is provided without a periodic bill.[2]  35-A M.R.S. § 7101(6) (2022).  The prepaid wireless fee requires that "seller[s] of prepaid wireless telecommunications services . . . collect the prepaid wireless fee from the prepaid wireless consumer for each retail transaction occurring in this State."[3]  35-A M.R.S. § 7104-C(2)(A) (2022). Maine law defines "[p]repaid wireless telecommunications service" as "a cellular or wireless telecommunications service that allows a caller to dial 9-1-1 to access the E-9-1-1 system, which service must be paid for in advance and is sold in

---

[2]  Effective January 1, 2019, the Legislature rescinded the applicability of the prepaid wireless fee to "prepaid wireless telecommunications service supported by federal universal service support funds."  P.L. 2017, ch. 422, § 1.

[3]  Although a fee is not a tax, *see Bd. of Overseers of the Bar v. Lee,* 422 A.2d 998, 1004 (Me. 1980), because 36 M.R.S. § 111(5) (2022) defines a tax as including a "fee . . . subject to collection by the [A]ssessor pursuant to statute," and because 35-A M.R.S. § 7104-C (2022) provides for remittance of the prepaid wireless fee to the Assessor, the Assessor's authority to collect the fee is implicit, and we apply the same rules of statutory construction and standard of review for the Assessor's fee determination as its determination regarding the service provider tax.

8

predetermined units or dollars that declines with use in a known amount."

25 M.R.S. § 2921(13); 35-A M.R.S. § 7102(4).

[¶14] For TracFone's SafeLink service to be a prepaid wireless telecommunications service and therefore subject to the prepaid wireless fee assessed, it must be "paid for in advance" and "sold in predetermined units or dollars that decline[] with use in known amounts." 25 M.R.S. § 2921(13); 35-A M.R.S. § 7102(4).

[¶15] We turn first to the "paid for in advance" requirement. The Federal Lifeline program pays ETCs for services after the services are provided. Under the Lifeline program,

> (c) [a]n eligible telecommunications carrier offering a Lifeline service that does not require the eligible telecommunications carrier to assess and collect a monthly fee from its subscribers:
>
> > (1) Shall not receive universal service support for a subscriber to such Lifeline service until the subscriber activates the service by whatever means specified by the carrier, such as completing an outbound call; and
> >
> > (2) After service activation, an eligible telecommunications carrier shall only continue to receive universal service support *reimbursement* for such Lifeline service provided to subscribers who have used the service within the last 30 days, or who have cured their non-usage . . . .

47 C.F.R. § 54.407(c) (2020) (emphasis added); *see also In re Lifeline & Link Up Reform Modernization*, 27 FCC Rcd. 6787, ¶ 303 (2012) ("ETCs seeking support

for low-income service provided in the preceding month shall submit to USAC no later than the eighth day of each month [a report supporting their claims] in order to receive a low-income disbursement at the end of that same month.").

[¶16]   Given that TracFone did not charge any SafeLink users for the service during the audit period,[4] TracFone received all Lifeline payments for a customer following the consumer's use of the service.[5]   By the Lifeline program's plain terms, there is no indication that, under federal law or regulation, TracFone would have received payment from USAC prior to providing the service.  In that strict sense, the service was not prepaid.

[¶17]   It is true that TracFone's SafeLink bears some hallmarks of a prepaid plan, such as having no monthly billing relationship with the consumer.

---

[4]   The Assessor argues that "TracFone's customers also provided certain consideration for [SafeLink] . . . before a customer's service was activated," and, therefore, the service was paid for in advance because of the consideration provided by consumers.  However, for consideration to be "valid," it must be valuable; that is, it must "confer[] a pecuniarily measurable benefit on one party or impose[] a pecuniarily measurable detriment on the other."  *Valuable Consideration*, Black's Law Dictionary (11th ed. 2019).  The taxes and fees were assessed solely against the $9.25 subsidy provided to TracFone, so any consideration the consumer provided was valueless and therefore not valid under the law.  *See id.*

[5]   The Assessor argues that the record demonstrates instances in which TracFone was paid prior to the Lifeline service being activated, and that this renders the entire SafeLink program prepaid.  Even if we view the record evidence in the light most favorable to the State, *see Stewart Title Guar. Co. v. State Tax Assessor*, 2009 ME 8, ¶ 11, 963 A.2d 169, the regulations still clearly state that USAC would reimburse TracFone only *after* the consumer had activated the SafeLink service.  *See* 47 C.F.R. § 54.407(c)(1) (2020).  We do not find compelling the argument that the minor corrections TracFone made to its filings with USAC, which occasionally led to TracFone collecting, during the audit period, payment before the user had activated the program, invalidated the entire structure of the Lifeline program.

10

In addition, TracFone had previously described its SafeLink program as following a prepaid model. However, the record contains no evidence of any consistent practice of payment by USAC to TracFone in advance of TracFone's rendering the service being paid for. *See* 47 C.F.R. § 54.407(c). The SafeLink program, therefore, falls somewhere between a prepaid and postpaid telecommunications plan.[6] Given that we strictly construe tax statutes against the taxing entity, *see Goggin*, 2018 ME 111, ¶ 13, 191 A.3d 341, the SafeLink plan cannot be considered "paid for in advance." Because the SafeLink plan is not "paid for in advance," the prepaid wireless fee does not apply, and, therefore, we need not address whether there was a retail transaction or whether the Assessor had the authority to audit, assess, and sue TracFone for the prepaid wireless fees. We therefore vacate the court's grant of a summary judgment in favor of the Assessor with respect to the prepaid wireless fee and remand for entry of summary judgment in favor of TracFone.

---

[6] Despite the Assessor's claim to the contrary, TracFone is not judicially estopped from claiming that its Lifeline service is not prepaid. Judicial estoppel "prohibits parties from deliberately changing positions according to the exigencies of the moment" and applies when a party takes positions that are "clearly inconsistent" with each other, the party in the previous action "successfully convinced the court to accept the inconsistent position" in the previous action, and the party gained an unfair advantage due to the change in position. *In re Child of Nicholas P.*, 2019 ME 152, ¶ 16, 218 A.3d 247 (alteration and quotation marks omitted). There is no indication that the PUC's order granting TracFone's ETC status was predicated on it being a prepaid service, meaning, at the very least, that TracFone gained no unfair advantage due to any change in its position.

### 3. Service Provider Tax

[¶18] The service provider tax is applied to the value of certain services, including "telecommunications" and "ancillary services," that are sold in Maine.[7] 36 M.R.S. § 2552(1)(E), (L). The statute provides that "[v]alue is measured by the sale price." *Id.* § 2552(2). The definitions section of the statute defines "sale price" as follows:

> "Sale price" means the total amount of consideration, including cash, credit, property and services, for which personal property or services are sold, leased or rented, valued in money, whether received in money or otherwise, without any deduction for the cost of materials used, labor or service cost, interest, losses and any other expense of the seller. "Sale price" includes any consideration for services that are a part of a sale.

36 M.R.S. § 2551(15) (2016). The version of the statute in effect at the time the tax was assessed had several exclusions from the definition of "[s]ale price," none of which were applicable here. *See id.* The service provider tax is a "levy on the seller" but can be passed to the consumer. 36 M.R.S. § 2552(2). TracFone argues that it is not subject to the service provider tax because no sale occurred,

---

[7] "Telecommunications services" are defined as "the electronic transmission, conveyance or routing of voice, data, audio, video or any other information or signals to a point or between or among points." 36 M.R.S. § 2551(20-A) (2016). An "ancillary service" is "a service that is associated with or incidental to the provision of telecommunications services, including, but not limited to, detailed telecommunications billing service, directory assistance, vertical service and voice mail service." *Id.* § 2551(1-C). There is no dispute that TracFone's SafeLink service was a telecommunications service that offered ancillary services during the audited period.

and, even if a sale had occurred, subsequent legislative history indicates that the Legislature never intended to subject SafeLink and other Lifeline services to taxes and fees. These arguments are both unpersuasive.

### a. The SafeLink Transaction

[¶19] A "sale" is "fundamentally an exchange of goods or services for a price or consideration." *State Tax Assessor v. MCI Commc'ns Servs., Inc.*, 2017 ME 119, ¶ 14, 164 A.3d 952; 36 M.R.S. § 1752(13) (2022) (defining "[s]ale" for the purposes of the sales tax as "any transfer, exchange or barter, in any manner or by any means whatsoever, for consideration."). Sale price can include any value received for a retail sale, *Flippo v. L.L. Bean, Inc.*, 2006 ME 62, ¶ 10, 898 A.2d 942, and can include payments made by third parties, *see Apple Inc.*, 2021 ME 8, ¶¶ 16-17, 254 A.3d 405; *Flippo*, 2006 ME 62, ¶¶ 12-13, 898 A.2d 942; *Flik Int'l Corp. v. State Tax Assessor*, 2002 ME 176, ¶ 19, 812 A.2d 974. A sale can also occur even when the consideration is not received until a later time. *See Flippo*, 2006 ME 62, ¶ 16, 898 A.2d 942.

[¶20] There is no ambiguity in the statute; it applies to the value of telecommunications services sold in Maine. It is undisputed that TracFone received consideration for the services that it provided under the SafeLink program. TracFone does not contest that it purchases telecommunications

services for resale. The mechanics of the process amount to a sale: the user signs up for a service and receives minutes from TracFone, and TracFone then receives payment from USAC. There is no requirement that the payment to a seller must be made by the customer in order for the transaction to be considered a retail sale; the sale price may be paid to the seller by a third party after the transaction.[8] *Cf. Apple Inc.*, 2021 ME 8, ¶¶ 16-17, 254 A.3d 405. For the above reasons, TracFone's SafeLink service is "sold" and therefore taxable under 36 M.R.S. § 2552.

### b.    Subsequent Legislative Action

[¶21] TracFone argues that, even if SafeLink was "sold" for the purposes of the service provider tax, the 128th Legislature's passage of chapter 422 of Public Law 2017, enacted following the audit, demonstrates that the Legislature never intended to tax SafeLink and other Lifeline programs. TracFone argues that statements made during the 128th Legislature's passage of P.L. 2017, ch. 422, indicate the 128th Legislature's intention to clarify that the 121st Legislature did not intend for the statute providing for the service

---

[8]  In the period at issue, there was no exception for payments from a federal program. *See id*. § 2551(15), *amended by* P.L. 2017, ch. 422, §§ 7-9 (effective Jan. 1, 2019).

provider tax statute to apply to services paid for with federal universal support funds.

[¶22]  As noted, the plain language of the applicable statute clearly stated, "'Sale price' means the total amount of consideration, including cash, credit, property and services, for which personal property or services are sold, leased or rented, valued in money, whether received in money or otherwise . . . ." 36 M.R.S. § 2551(15).  There was no exception for government payments.  *See id.*

[¶23]  The statute was amended by P.L. 2017, ch. 422, § 10, effective January 1, 2019, to exclude from the definition of sale price "[f]ederal universal service support funds that are paid directly to the seller pursuant to 47 Code of Federal Regulations, Part 54."  In other words, the transaction at issue here would now be excluded from the service provider tax.  Because the statute as it existed at the time of these events was unambiguous, however, we apply that plain language and do not look to legislative history.  *See Wawenock, LLC v. Dep't of Transp.*, 2018 ME 83, ¶ 7, 187 A.3d 609 ("If the statute is unambiguous, we interpret the statute according to its unambiguous language.").

**B.     Motion to Compel**

[¶24]  In the trial court, TracFone sought to invoke 36 M.R.S. § 112(1) (2022) as a defense, arguing that, when the Assessor assessed the prepaid wireless fee and service provider tax against TracFone, it was a change in the Assessor's policy and practices.  In relevant part, 36 M.R.S. § 112(1) provides that "[w]hen a significant change has occurred in bureau policy or practice or in the interpretation by the bureau of any law, rule or instruction bulletin, the assessor shall, within [sixty] days of the change, provide to [a] publishing entity or entities written notice, suitable for publication, of the change."  TracFone contends that the Assessor's decision to assess the service provider tax during the audit period amounted to a "significant change," and, during discovery, TracFone sought the production of documents that it believed would support this contention.[9]  Because section 112 would have to provide taxpayers a

---

[9]  "[S]ignificant change" is not defined in statute.  *See* 36 M.R.S § 112 (2022).  The term is used only in one other statute in Title 36.  *See* 36 M.R.S. § 194-A(1) (2022) ("Before implementing a significant change in policy, practice or interpretation of the sales and use tax law that would result in additional revenue, the State Tax Assessor shall consult with the Office of the Attorney General.")  The trial court assumed that there was a significant change in this case.  TracFone was assessed for the service provider tax and, because SafeLink had been operating since March 2010, because the service provider tax had been in effect prior to then, *see* P.L. 2007, ch. 627, § 69 (adding "ancillary services" to the service provider tax); P.L. 2003, ch. 673, pt. v, §§ v-25, v-29 (enacting the service provider tax), and because the service provider tax had assumedly not been assessed for that prior period, there likely was a significant change in regard to the service provider tax.

16

defense for the documents to be admissible in evidence, we first address section 112's meaning and application.

[¶25]  The plain language of section 112 provides neither any defense for those who have been affected by the Assessor's actions (or lack thereof) nor any consequence for the Assessor should it fail to comply.  *See Bureau v. Staffing Network, Inc.*, 678 A.2d 583, 590 (Me. 1996) ("We do not create a remedy or penalty when a statute is silent regarding the sanction for failure of an agency to timely act.").  Section 112(1) is not mere surplusage, however, because 5 M.R.S. § 11001(2) (2022) permits taxpayers "aggrieved by the failure or refusal of an agency to act" to seek relief in the form of a court order requiring the agency—here the Assessor—to act.

[¶26]  We reject TracFone's argument that, because 36 M.R.S. § 194-A(4) (2022) expressly provides that the Assessor's failure to take a different procedural step within a certain period provides no defense,[10] a defense is

---

[10]  The statute reads:

1. **Consultation.**  Before implementing a significant change in policy, practice or interpretation of the sales and use tax law that would result in additional revenue, the State Tax Assessor shall consult with the Office of the Attorney General.

   . . . .

4. **Assessment validity.**  This section establishes a procedural consultation and notification requirement to assist routine legislative oversight and does not affect the validity of any assessment or tax liability issued pursuant to or arising under this Title.

impliedly found in section 112. If we were to invalidate the acts of the Assessor for not complying with section 112, we would be reading language into section 112(1) that does not exist. *See Bureau,* 678 A.2d at 590. Additionally, if we were to interpret the absence of language like that found in section 194-A(4) to mean that section 112(1) provided a defense, any law that did not state otherwise and used the term "shall" could then be used as a defense. *See, e.g.*, 36 M.R.S. § 1760-D(1) ("The assessor shall post on the bureau's publicly accessible website, and update quarterly, a list of products . . . to which the assessor has made a written determination on the applicability of a sales tax exemption."). Because TracFone's section 194-A argument would require us to read language into a law and would have broad implications on Maine's tax code, we reject this argument.

[¶27] Because section 112 does not provide TracFone a defense, the trial court did not abuse its discretion in denying TracFone's motion to compel the production of the documents.

The entry is:

> Summary judgment in the Assessor's favor on the prepaid wireless fee vacated. Remanded for entry of summary judgment in TracFone's favor. Summary judgment in the Assessor's favor on

---

36 M.R.S. § 194-A.

the service provider tax affirmed.  Denial of TracFone's motion to compel affirmed.

_____

Jonathan M. Duntiz, Esq. (orally), Verrill Dana LLP, Portland, for appellant TracFone Wireless, Inc.

Aaron M. Frey, Attorney General, Thomas A. Knowlton, Dep. Atty. Gen. (orally), and Kimberly L. Patwardhan, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State Tax Assessor

Business and Consumer Docket docket number AP-2019-1
FOR CLERK REFERENCE ONLY