MAINE SUPREME JUDICIAL COURT                              Reporter of Decisions
Decision:    2023 ME 68
Docket:      BCD-22-331
Argued:      September 12, 2023
Decided:     November 7, 2023
Revised:     November 28, 2023

Panel:       STANFILL, C.J., and MEAD, JABAR, HORTON, LAWRENCE, and DOUGLAS, JJ.

EXPRESS SCRIPTS INC. et al.

v.

STATE TAX ASSESSOR

JABAR, J.

[¶1]   Express Scripts Inc. (ESI) and its unitary Maine affiliates (collectively, Express Scripts) appeal from an order entered in the Business and Consumer Docket (*Duddy, J.*) granting summary judgment approving the State Tax Assessor's method of calculating Express Scripts' Maine tax liability. The Assessor cross-appeals from the trial court's (*Murphy, J.*) order sealing certain aspects of the parties' filings pursuant to Maine Rule of Civil Procedure 56, and the trial court's (*Duddy, J.*) subsequent order denying the Assessor's motion to unseal. We affirm the judgment and the challenged orders.

## I.  BACKGROUND

[¶2]   During 2011, 2012, and 2013 (the Audit Period), ESI was a corporation organized under Delaware law with its headquarters and executive

offices in St. Louis, Missouri. On April 2, 2012, Express Scripts Holding Company, the parent company of ESI, acquired the stock of Medco Health Solutions, Inc., and its affiliates. ESI and its affiliated entities were engaged together in a unitary business that involved business activity both within and outside Maine.[1]

[¶3] During the Audit Period, Express Scripts sold prescription drugs by mail order delivery and provided infusion services throughout the United States, including Maine. Additionally, Express Scripts sold claims adjudication and other pharmacy benefit management (PBM) services throughout the United States, including in Maine.[2] During the Audit Period, Express Scripts

---

[1] "Unitary business" is defined by Maine statute as "a business activity which is characterized by unity of ownership, functional integration, centralization of management and economies of scale." 36 M.R.S. § 5102(10-A) (2023); *see also State Tax Assessor v. Kraft Foods Grp., Inc.*, 2020 ME 81, ¶¶ 19, 38, 42, 235 A.3d 837; *Gannett Co. v. State Tax Assessor*, 2008 ME 171, ¶¶ 12-13, 959 A.2d 741. "The unitary business concept ignores the separate legal existence of corporations . . . and focuses on such practical business realities as transfers of value among affiliated corporations." *Gannett*, 2008 ME 171, ¶ 13, 959 A.2d 741; *see Kraft*, 2020 ME 81, ¶ 19, 235 A.3d 837.

[2] Express Scripts repeatedly attempts to qualify or dispute the Assessor's description of its business activities by asserting that what it sold was a "core bundle of services." However, this phrase does not appear in any of Express Scripts' PBM agreements, invoices, receipts, or any other record material. "[E]xtrinsic evidence is not admissible to explain or alter an unambiguous integrated contract." *Doe v. Lozano*, 2022 ME 33, ¶ 17, 276 A.3d 44. The provisions of such contracts must be interpreted "according to [their] plain meaning." *Fortney & Weygandt, Inc. v. Lewiston DMEP IX, LLC*, 2019 ME 175, ¶ 34, 222 A.3d 613 (quotation marks omitted). Thus, the affidavits submitted by Express Scripts in support of its "core bundle of services" argument would not be admissible as evidence to explain the contract and transactional material comprising much of the record. *See* M.R. Civ. P. 56(e). Therefore, Express Scripts' "core bundle of services" argument has no factual support in the record, and to the extent that Express Scripts uses that phrase in its argument to attempt to create a genuine issue of material fact to survive a motion for summary judgment, the argument fails.

generated revenue primarily from the delivery of prescription drugs through its contracted network of retail pharmacies, from home delivery of prescription drugs, from specialty pharmacy services, and from services in its non-PBM business segment. Revenues from the delivery of prescription drugs to Express Scripts' members represented 99.4% of revenues in 2011; 99.0% of revenues in 2012; and 98.8% of revenues in 2013.

[¶4] Express Scripts' "clients" during the Audit Period included health insurers, health maintenance organizations, employers, governmental health programs, and union-sponsored benefits plans. The clients' "members" were the primary recipients of Express Scripts' services. If a client was a health insurer, the term "members" referred to the insured individuals; if a client was an employer, then the term "members" referred to the employees covered by the employer's health plan. The parties agree that, except for pricing, Express Scripts' agreements with its clients are substantially the same in all material respects. Pursuant to written agreements with retail pharmacies that were in effect during the Audit Period, Express Scripts negotiated the prices at which retail pharmacies would provide prescription drugs to individual members and managed national and regional networks that were responsive to client

4

preferences related to cost containment, convenience of access for members, and network performance.

[¶5]  When a member presented his or her Express Scripts identification card at a retail pharmacy, Express Scripts communicated in real time with the pharmacy to process prescription drug claims at the point of sale.  The pharmacist sent the member's prescription information to Express Scripts through its computer system, and Express Scripts processed the claim and responded back to the pharmacist in real time.  This process is referred to as the "adjudication of claims."  The claims-adjudication process included Express Scripts'  (A) confirming the member's eligibility to the pharmacist; (B) performing a concurrent drug interaction/utilization review; (C) confirming to the retail pharmacy that it would receive payment from Express Scripts pursuant to their agreements, if the claim was accepted; and (D) informing the retail pharmacy of the co-payment amount to be collected from the member.

[¶6]  Express Scripts filed its original 2011 Maine corporate income tax return in October 2012 and reported an overall Maine sales factor of 0.008036.[3]

---

[3]  The sales factor indicates the portion of a corporate taxpayer's income that is subject to tax in Maine, and is represented as "a fraction, the numerator of which is the total sales of the taxpayer in [Maine] during the tax period, and the denominator of which is the total sales of the taxpayer

In calculating the sales factor on the original 2011 Maine corporate income tax return, Express Scripts apportioned receipts from the performance of its PBM services on a *market member* basis.[4]

[¶7]  ESI, Medco, and their affiliates filed their 2012 Maine corporate income tax return in October 2013 and reported an overall Maine sales factor of 0.002021.  In calculating the sales factor applicable to its portion of the unitary business, Medco apportioned receipts from the performance of its PBM services on a market member basis, but ESI changed the method it used to apportion receipts to calculate its sales factor, apportioning receipts from ESI's performance of PBM services on a *market client* basis.[5]  ESI made this change even though its business operations and the applicable Maine statutes and rules had not changed; and ESI did not notify Maine Revenue Service (MRS) that it

---

everywhere during the tax period."  36 M.R.S. § 5211(14) (2023); *see Kraft*, 2020 ME 81, ¶¶ 1 n.2, 14, 235 A.3d 837.

[4]  The term "market member basis" describes the method of apportioning receipts from the performance of PBM services to the state in which the prescription drug is dispensed to members by the retail pharmacies.

[5]  The term "market client basis" describes the method of apportioning receipts from the performance of PBM services to the location of the primary commercial and administrative headquarters of clients.

6

had changed its method even though it was obligated by regulation to do so. *See* 18-125 C.M.R. ch. 801, § .05 (effective Mar. 19, 2011).[6]

[¶8]  ESI, Medco, and affiliates filed their 2013 Maine corporate income tax return in October 2014, reported an overall Maine sales factor of 0.001495, and apportioned to Maine 0.00001433 of ESI's $1,089,214,812 in reported separate taxable income for 2013.  In calculating the sales factor for 2013, ESI and Medco both apportioned receipts from the performance of PBM services on a market client basis, rather than on a market member basis.

[¶9]  Starting in 2015, MRS conducted an audit of Express Scripts' Maine corporate income tax returns for 2011-2013.  On or about April 28, 2015, Express Scripts and affiliates filed an amended 2011 Maine return seeking a refund of $962,281.  On September 17, 2015, MRS denied Express Scripts' 2011 refund claim.  After the audit, on October 1, 2015, MRS issued a notice of assessment, asserting that Express Scripts owed $1,897,260.54 in back taxes, comprising $1,646,352 in tax and $250,908.54 in interest.  The principal audit adjustment by MRS for the Audit Period resulted from MRS's determination

---

[6]  This regulation has since been amended, but not in a way that affects this appeal.  *See* 18-125 C.M.R. ch. 801, § .05 (effective Apr. 20, 2022).

that the receipts from Express Scripts' performance of PBM services should be apportioned on a market member basis.

[¶10]  Express Scripts timely requested reconsideration of the denial of its refund claim for 2011 and reconsideration of the assessment, pursuant to 36 M.R.S. § 151(1) (2023).  On January 22, 2018, MRS issued a reconsideration decision upholding both its denial of the refund claim for 2011 and the assessment for the Audit Period, but adjusting the back tax assessment, asserting that Express Scripts owed $810,292 in tax and $86,081.22 in interest, for a total assessment of $896,373.22.  Additional interest of $163,806.71 accrued from the date of assessment through February 15, 2018, bringing the total balance due to $1,060,179.93.  Express Scripts timely filed a statement of appeal with the Maine Board of Tax Appeals.  On August 9, 2019, the Board issued a decision upholding the reconsideration decision.

[¶11]  On October 1, 2019, Express Scripts filed a petition for review and de novo determination in the Superior Court (Kennebec County).  *See* 5 M.R.S. §§ 11001(1), 11002 (2023); 36 M.R.S. § 151(2)(E)-(G); M.R. Civ. P. 80C.  In its petition, Express Scripts requested relief under six counts:

- In Count 1, Express Scripts argued that pursuant to 36 M.R.S. § 5211(16-A)(A) (2023), receipts from the performance of its PBM services should be apportioned to Maine based on a market client basis because the services were received at its clients' commercial and

administrative headquarters, not at the location of the retail pharmacies where members filled prescriptions.

- In Count 2, Express Scripts argued in the alternative that pursuant to 36 M.R.S. § 5211(16-A)(A), if the location where its services were received is not readily determinable, those receipts should be attributed to its clients' commercial and administrative headquarters because those were the locations from which its clients ordered the services.

- In Count 3, Express Scripts argued that, if it is determined that the statutory apportionment provisions require the sourcing of receipts from the performance of PBM services to the location of the retail pharmacies where members filled prescriptions, Express Scripts is entitled to an alternative apportionment pursuant to 36 M.R.S. § 5211(17)(D) that fairly represents the extent of its business activities in Maine.

- In Count 4, Express Scripts raised an alternative claim that, if it is determined that receipts from the performance of its PBM services should be apportioned to Maine on a market member basis pursuant to 36 M.R.S. § 5211(16-A)(A), that apportionment methodology results in attribution of income to Maine that is out of all appropriate portion to Express Scripts' activities in the state in violation of the Due Process and Commerce Clauses of the United States Constitution.

- In Count 5, Express Scripts argued that the Assessor failed to determine Express Scripts' correct tax liability pursuant to 36 M.R.S. § 141 (2023).

- Finally, in Count 6, Express Scripts argued that any interest that has accrued against Express Scripts for failure to pay tax as a result of this litigation should be abated pursuant to 36 M.R.S. § 186 (2023).

[¶12] The matter was transferred to the Business and Consumer Docket. On January 20, 2022, the Assessor moved for summary judgment on all counts. Express Scripts opposed the Assessor's motion for summary judgment, and the parties filed stipulated exhibits and limited stipulated fact statements. On

September 26, 2022, the trial court issued an order granting the Assessor's motion for summary judgment on all counts.

[¶13] In its order granting summary judgment, the trial court addressed Counts 1, 2, 4, and 5 together. It posited that because these counts all "address the methodology employed by the Assessor to calculate the tax due," they should all be reviewed under the standard articulated by the United States Supreme Court in *Container Corporation of America v. Franchise Tax Board*, 463 U.S. 159, 169-70 (1983). That standard requires the taxpayer to show, by "clear and cogent evidence," that a calculated apportionment is "out of all appropriate proportions to the business transacted by" the taxpayer in a given state, or that it leads to a "grossly distorted result." *Id.* at 170 (quotation marks omitted). The trial court granted summary judgment to the Assessor on all four counts because it concluded that Express Scripts had failed to meet that burden.

[¶14] Prior to the trial court's grant of summary judgement, Express Scripts had requested that certain information in the summary judgment record be sealed, and the trial court granted that request, finding that the information at issue was proprietary and should therefore be treated as confidential. Following the trial court's grant of summary judgment, the Assessor filed a motion to unseal that information, arguing that it is not

designated confidential by any statute or court rule. The trial court denied this motion, finding that Express Scripts had "satisfied [its] burden to justify the need for confidentiality, by submitting affidavits that persuasively describe the harm to their business that would occur should the [information] be made public."

[¶15] Express Scripts timely appealed the trial court's grant of summary judgment to the Assessor, *see* 14 M.R.S. § 1851 (2023); M.R. App. P. 2B(c)(1), and the Assessor timely cross-appealed the trial court's confidentiality orders, M.R. App. P. 2C(a)(2).

## II. DISCUSSION

[¶16] In its appeal, Express Scripts abandons its arguments on Counts 3-6 and argues that (1) the trial court applied the incorrect legal standard in evaluating whether Express Scripts established its prima facie case under Counts 1 and 2 and (2) as a result, it also erred in determining that there was no genuine dispute of material facts. In its cross-appeal, the Assessor argues that the trial court abused its discretion when it initially sealed certain portions of the summary judgment record and subsequently denied the Assessor's motion to unseal. We address each appeal in turn.

## A. Motion for Summary Judgment

[¶17]  We turn first to Express Scripts' appeal.  As explained more completely below, we agree with Express Scripts' first argument that the trial court applied an improper legal standard in evaluating whether Express Scripts established its prima facie case for Counts 1 and 2 of the petition for review. However, we disagree with Express Scripts' second contention that, under the proper legal standard, there remains a genuine dispute of material fact that prevents summary judgment in the Assessor's favor.

### 1. Standard of Review

[¶18]  We review a trial court's grant of summary judgment de novo, affirming when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *State Tax Assessor v. TracFone Wireless, Inc.*, 2022 ME 36, ¶ 11, 276 A.3d 521; M.R. Civ. P. 56(c).  "We also review de novo issues of statutory interpretation," examining "the trial court's [decision] without deference to the Board's legal determinations."  *TracFone Wireless*, 2022 ME 36, ¶ 11, 276 A.3d 521.

### 2. The trial court applied the wrong legal standard.

[¶19]  The trial court applied the wrong legal standard to Counts 1 and 2. It reviewed those counts, along with Counts 4 and 5, under the "gross

distortion" standard from *Container Corporation of America*, which applies where a taxpayer challenges a state's apportionment formula under the Due Process and Commerce Clauses of the United States Constitution. 463 U.S. at 169-170; *see Gannett Co. v. State Tax Assessor*, 2008 ME 171, ¶ 28, 959 A.2d 741 ("[T]he Commerce Clause requires any apportionment formula to be fair and to avoid gross distortion."); *State Tax Assessor v. Kraft*, 2020 ME 81, ¶ 12 n.6, 235 A.3d 837. This is the appropriate standard of review for Counts 4 and 5, in which Express Scripts sought a declaration that the Assessor's formula was unconstitutional. However, in Counts 1 and 2, Express Scripts did not assert claims for relief under the United States Constitution. Instead, in Counts 1 and 2, Express Scripts asserts *statutory* claims, arguing alternative theories of why the Assessor's preferred apportionment formula does not comport with the requirements of 36 M.R.S. § 5211(16-A)(A).

[¶20] Therefore, to resolve Counts 1 and 2, the trial court should have determined whether, under 36 M.R.S. § 5211(16-A)(A), Express Scripts' receipts from the performance of PBM services should have been apportioned to Maine based on the location of the primary commercial and administrative headquarters of Express Scripts' clients (i.e., the market client method described *supra* in note 5), as Express Scripts contends, or whether those

receipts should have been apportioned to Maine based on the location of the retail pharmacies where prescriptions were filled for members (i.e., the market member method described *supra* in note 4), as the Assessor contends. Because we are reviewing a motion for summary judgment decided on stipulated facts and exhibits, we examine this issue de novo. *See Apple Inc. v. State Tax Assessor*, 2021 ME 8, ¶ 12, 254 A.3d 405.

**3.    Under the proper legal standard, summary judgment was still appropriate.**

[¶21]  We review the relevant statutory framework before determining whether there is a genuine dispute of material fact that would prevent summary judgment.

**a.    Statutory Framework**

[¶22]  When interpreting a statute, we look to the "plain meaning of the statutory language to give effect to the Legislature's intent, and only if the statute is ambiguous will we look beyond that language to examine other indicia of legislative intent, such as legislative history." *TracFone Wireless*, 2022 ME 36, ¶ 12, 276 A.3d 521 (quotation marks omitted).  In determining plain meaning, we will "consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Koch Refin. Co. v. State Tax Assessor*, 1999 ME 35,

¶ 4, 724 A.2d 1251 (quotation marks omitted).  Tax statutes are to be construed "most strongly against the government and in the taxpayer's favor, and we will not extend a taxation statute's reach beyond the clear import of the language used."  *TracFone Wireless*, 2022 ME 36, ¶ 12, 276 A.3d 521 (alterations and quotation marks omitted).

[¶23]  Under the Maine Corporate Income Tax Law, to determine the taxable income of a multi-state unitary business that operates through affiliated corporations, all the affiliated corporations—including the ones that do not have a presence in Maine—are grouped as a single unit (the unitary business), and the incomes of all these affiliates are aggregated.  36 M.R.S. §§ 5210-5211 (2023); *see Kraft*, 2020 ME 81, ¶¶ 1 n.2, 14, 23-24, 42, 235 A.3d 837; *Gannett*, 2008 ME 171, ¶¶ 11-12, 959 A.2d 741.  There is no dispute that Express Scripts and all its members were engaged in a unitary business that involved activity both within and outside Maine.

[¶24]  Having determined that a group of corporations constitute a unitary business, a state may apply its apportionment formula to all the income from the unitary business, provided that the formula complies with the Due Process and Commerce Clauses.  *See Container Corp. of Am.*, 463 U.S. at 169-70; *Kraft*, 2020 ME 81, ¶ 12 n.6, 235 A.3d 837.  Under 36 M.R.S. § 5220(5) (2023),

a corporation that is a member of an affiliated group and engaged in a unitary business with one or more members of that group is required to file, in addition to a tax return, a combined report in accordance with 36 M.R.S. § 5244 (2023). Combined reports require, among other things, a listing of the sales in Maine and everywhere by each affiliate that is a member of the unitary business. 36 M.R.S. § 5244.

[¶25]  A taxpayer corporation's income is apportioned to Maine by multiplying its income by its sales factor. *Id.* § 5211(8).  As described *supra* in note 3, the sales factor is a fraction that, for each year, is the taxpayer's total sales in Maine divided by its total sales everywhere. *Id.* § 5211(14).  Total sales of the taxpayer "includes sales of the taxpayer and of any member of an affiliated group with which the taxpayer conduct[ed] a unitary business" during the tax year. *Id.*  Sales means "all gross receipts of the taxpayer." *Id.* § 5210(5).

[¶26]  The pertinent statute here, 36 M.R.S. § 5211(16-A)(A), provides the basic rule for where to attribute receipts from the sale of services when calculating the sales factor:

> Except as otherwise provided by this subsection, *receipts from the performance of services must be attributed to the state where the services are received*.  If the state where the services are received is not readily determinable, the services are deemed to be received at the home of the customer or, in the case of a business, the office of the customer from which the services were ordered in the regular

course of the customer's trade or business. If the ordering location cannot be determined, the services are deemed to be received at the home or office of the customer to which the services are billed.

(Emphasis added.)

[¶27] Section 5211(16-A)(A)'s mandate is clear—income must be apportioned to the location where the service is *received*. *See id.* And here, neither party disputes that requirement. Instead, they disagree on the factual question of *where* Express Scripts' services were received during the Audit Period. Because the existence of a genuine dispute of material fact will prevent summary judgment, we must determine whether this factual dispute rises to that level.

### b.   Existence of a Genuine Dispute of Material Fact

[¶28] We review de novo whether a genuine dispute of material fact exists. *Angell v. Hallee*, 2014 ME 72, ¶ 16, 92 A.3d 1154; *see* M.R. Civ. P. 56(c). "A fact is material if it has the potential to affect the outcome of the suit, and a genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive." *Id.* ¶ 17 (quotation marks omitted). To generate a genuine issue of material fact, the nonmoving party must demonstrate that the summary judgment record affirmatively supports the existence of a genuine

issue of material fact, and cannot simply rely on "conclusory allegations, improbable inferences, and unsupported speculation." *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821 (quotation marks omitted).

[¶29] In addition, when the taxpayer, who bears the burden of proof on appeal, 36 M.R.S. § 151-D(10)(I) (2023), is the nonmoving party, it must present sufficient evidence to establish its prima facie case. *See BCN Telecom, Inc. v. State Tax Assessor*, 2016 ME 165, ¶ 13, 151 A.3d 497. Therefore, to prevail here, Express Scripts must present evidence sufficient to establish a prima facie case that its services were received at the commercial and administrative headquarters of its clients and must demonstrate that the record affirmatively indicates that this fact remains in dispute. *See Estate of Cabatit v. Canders*, 2014 ME 133, ¶ 8, 105 A.3d 439.

[¶30] There is no dispute that Express Scripts was performing services for the purposes of section 5211(16-A)(A) when it provided the PBM services as part of its PBM agreements with clients. There is also no dispute that the receipts at issue consist of ingredient costs, dispensing fees, and administrative fees paid by Express Scripts' clients. Nor is there any dispute that the receipts at issue are from Express Scripts' performance of PBM services. Instead, the

dispute centers around what services were included in the receipts at issue and where those services were received. *See* 36 M.R.S. § 5211(16-A)(A).

[¶31] This dispute forms the basis of the difference between the market member and market client methods of apportioning income. The Assessor advocates for the market member method, arguing that individual members receive the services at issue when they fill prescriptions at retail pharmacies and Express Scripts provides claims processing services. Under the Assessor's theory, the retail pharmacy is the location where the service is received, and income generated from the performance of that service should be attributed to that retail pharmacy location. Express Scripts counters that the market client method is more appropriate, arguing that because it contracts with only its clients, not individual members, the ultimate recipient of its services is the client, even if it is the member who initiates the claim at the retail pharmacy. Therefore, according to Express Scripts, the services are received at the commercial and administrative headquarters of the client, not the retail pharmacy.

[¶32] We conclude that Express Scripts' argument fails for two reasons: (1) the summary judgment record repeatedly controverts Express Scripts' contention that clients are the recipients of its PBM services and (2) Express

Scripts has failed to point to specific facts that affirmatively show the existence of an authentic factual dispute to support their contention that the receipts at issue include charges for PBM services other than processing member claims at retail pharmacies.

[¶33]  First, contrary to Express Scripts' argument, the record indicates in numerous places that members received the claims processing services that were reflected in the receipts at issue.  In its Forms 10-K for 2011, 2012, and 2013, Express Scripts explained that, pursuant to its contract with one client, "Express Scripts provides [PBM] services *to members* of the affiliated health plans of [its clients]."  (Emphasis added.)  Express Scripts conceded during its deposition that it adjudicated and processed claims for "[a]ll the members of [a client's] affiliates."[7]  Using Express Scripts' agreement with one insurer as an example, the agreement defines "Covered Service" as "any medically necessary drugs, devices, supplies, equipment, and other items . . . dispensed to a Covered Individual."  A "Covered Individual" is defined as "an individual who is eligible,

---

[7] Throughout its opposition to the Assessor's statement of material facts in support of its motion for summary judgment, Express Scripts cites to affidavits submitted with its opposition to controvert the Assessor's contentions.  To the extent that Express Scripts offers these affidavits to controvert deposition testimony it offered in discovery, those arguments are meritless.  *See Zip Lube, Inc. v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733 (holding that a party opposing motion for summary judgment may not create a genuine issue of material fact by submitting affidavits to dispute its own deposition testimony).

as determined by [the insurer], to *receive* Covered Services under a Plan." The record establishes that the receipts at issue result from the performance of claims processing services for millions of members' prescription drug claims processed at retail pharmacies in Maine. Most notably, Express Scripts' Form 10-K for 2011 states explicitly: "Although we contract with health plans and employers, the ultimate *recipients* of many of our services are the members and employees of these health plans and employers." (Emphasis added.)

[¶34] Second, Express Scripts fails to carry its burden because the summary judgment record does not support the contention that the receipts at issue include charges for PBM services other than processing member claims at retail pharmacies. The receipts at issue are broken down into three components: ingredient costs, dispensing fees, and administrative fees. The summary judgment record establishes that these receipts resulted from the performance of claims processing services for members' prescription drug claims processed at retail pharmacies in Maine. According to the PBM agreements, these amounts were due Express Scripts "as a result of Pharmacy Claims" that they had "processed." A "[c]laim," under the PBM agreements, is a "request for reimbursement as a result of a Pharmacy dispensing a Covered Prescription to a Covered Individual." In other words, according to the PBM

agreements provided in the record, the receipts in question were provided in response to invoices Express Scripts generated each week seeking reimbursement for processing members' claims. It's clear from this record that if members had not gone to pharmacies to fill their prescriptions, Express Scripts would not have been entitled to that revenue.

[¶35] Because the record establishes that claims-processing services were received by members at retail pharmacies in Maine, and the receipts at issue were derived from the performance of these claims processing services, we conclude that there is no genuine issue of material fact, and the Assessor is entitled to judgment as a matter of law.[8]

## B. Sealed Records

[¶36] The Assessor cross-appeals from the trial court's order allowing Express Scripts to file certain information under seal and its later order denying the Assessor's motion to unseal. We review "[a] trial court's decision to seal records . . . for an abuse of discretion." *Apple*, 2021 ME 8, ¶ 40, 254 A.3d 405. "An abuse of discretion may be found where an appellant demonstrates that the

---

[8] Express Scripts argues in the alternative that if the location where the PBM services are received is not "readily determinable" under 36 M.R.S. § 5211(16-A)(A) (2023), then under the second sentence of that paragraph, receipts from the performance of PBM services should be apportioned to Maine based on the location of its clients' primary commercial and administrative headquarters. Because it is readily determinable that the PBM services are received at the retail pharmacies where members fill their prescriptions, we need not address this argument.

decisionmaker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. The proponent of sealing material filed with the court "has the burden to justify the request through a showing of need for confidentiality, typically through affidavits if the sealing request is opposed by another party or questioned by the court." *Apple*, 2021 ME 8, ¶ 39 n.4, 254 A.3d 405; *see* M.R.E.C.S. 10(A)(2)(b).

[¶37]  In *Apple*, we rejected the Assessor's argument that the trial court's order granting Apple's request to seal portions of the record was overly broad because the contracts at issue were old and had expired and held that while the trial court's order was broad, it did not reflect an abuse of discretion.  *Apple*, 2021 ME 8, ¶¶ 39-41, 254 A.3d 405.

[¶38]  Additionally, sitting as the Supreme Judicial Court, we adopted the Maine Rules of Electronic Court Systems, effective August 21, 2020, and provided guidance relevant to this issue.  Under M.R.E.C.S. 10(A)(2)(f), "[t]he court may seal or impound . . . a court record from public access if it finds that a reasonable expectation of privacy substantially outweighs the public interest in public access to the . . . court record."  "In weighing a reasonable expectation of privacy against the public interest in access to the . . . court record, the court

will consider . . . [a]n individual's substantial personal, business, or reputational interest[] and . . . [t]he public's interest in access to information in the court record." M.R.E.C.S. 10(A)(2)(f)(ii)-(iii). The Advisory Note to Rule 10 states:

> In determining whether to grant a motion to seal or impound, courts should be guided by the recognition that "the courts of this country recognize a general right to inspect and copy public records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). As courts have noted, however, this "general availability of court documents . . . is subject to 'countervailing interests [that] heavily outweigh the public interests in access.'" *Carey v. Me. Bd. of Overseers of the Bar*, 2018 ME 73, ¶ 11, 186 A.3d 848 (quoting *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)).

M.R.E.C.S. 10 Advisory Note [August 2020].

[¶39] The Assessor challenges two orders here. The first is an order on a request to file certain documents in the summary judgment record under seal, and the second is an order on the Assessor's motion to unseal some of the information in those documents, made after the trial court granted summary judgment.

[¶40] The Assessor argues that the trial court abused its discretion because Express Scripts did not provide the court with a sufficient basis to keep this information secret, because the information at issue was not confidential by statute or court rule and did not fall within any recognized restriction against disclosure under state or federal law, because the information is

24

already public,[9] and because Express Scripts failed to timely designate the information as confidential under the confidentiality order agreed to by the parties. Express Scripts argues that it has demonstrated sufficient need to maintain the confidentiality of the information, that at least some of the information was produced by Express Scripts during the Assessor's audit of the company and is therefore protected under 36 M.R.S. § 191(1) (2023),[10] that the information in question is not already publicly available, and that any information that may have been inadvertently made public in the pleadings is not determinative because M.R.E.C.S. 10(A)(2)(b) expressly states that a party

---

[9] The Assessor cites *Carey v. Me. Bd. of Overseers of the Bar*, 2018 ME 73, ¶ 12, 186 A.3d 848, to argue that information to which the public has already had access for a significant period should not be sealed. In *Carey*, we declined to order the sealing of information that had been public for three weeks. *Id*. The Assessor argues that, here, most of the client names at issue were public for more than four months and, following *Carey*, we should deny Express Scripts' motion to seal the information. However, under the Maine Rules of Electronic Court Systems, which were adopted effective August 21, 2020, a party "may file a motion to seal or impound a court record that is already accessible by the public." M.R.E.C.S. 10(A)(2)(b). These rules were adopted after *Carey* was decided and before the trial court issued its order granting Express Scripts' motion to seal the information. They are thus controlling here.

[10] Under 36 M.R.S. § 191(1) (2023), "[e]xcept as otherwise provided by law, it is unlawful for any person who, pursuant to this Title, has been permitted to receive or view any portion of the original or a copy of any report, return or other information provided pursuant to this Title to divulge or make known in any manner any information set forth in any of those documents or obtained from examination or inspection under this Title of the premises or property of any taxpayer." However, section 191(1) is subject to numerous exceptions, including 36 M.R.S. § 191(2)(C), which provides that subsection 1 cannot be construed to prohibit "the production in court or to the [Tax Board] on behalf of the State Tax Assessor . . . *of so much and no more of the information as is pertinent to the action or proceeding*." (Emphasis added.) Express Scripts relies on the emphasized text to argue that the Assessor bears the burden to overcome the general rule of confidentiality by establishing that the information sought to be unsealed is "pertinent" to the action or proceeding. We agree.

"may file a motion to seal or impound a court record that is already accessible to the public."

[¶41] Here, in the court's order sealing the information, the court acknowledged that the information at issue was not governed by the confidentiality order agreed to by the parties but that the information constituted proprietary information and should remain confidential and be maintained as "non-public" documents in the summary judgment record. The court reasoned that "the industry in question is highly-competitive and highly-consolidated" and that the information is "more than simply client identity"; rather it "includes the numbers of claims processed, and points to the nature and extent of Express Scripts' relationship with these clients."

[¶42] In the court's later order denying the Assessor's motion to unseal the information, it again stated that Express Scripts had satisfied its burden to justify the need for confidentiality. The court noted that Express Scripts submitted "affidavits that persuasively describe the harm to their businesses that would occur should the documents [at issue] be made public." The Assessor did not submit any affidavit countering the contentions made in Express Scripts' affidavit. Although the Assessor is correct to point out that Express Scripts failed to designate some of the information as confidential

according to the confidentiality order agreed to by the parties, and that at least some of the information has been available to the public, our review is for abuse of discretion, and there is nothing in the record to suggest that the trial court "exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Sager*, 2004 ME 40, ¶ 11, 845 A.2d 567.  Given the sparse factual record, we conclude that the trial court did not abuse its discretion in sealing the information at issue.  *See Apple Inc.*, 2021 ME 8, ¶ 41, 254 A.3d 405.

The entry is:

Judgment affirmed.

---

Jonathan A. Block, Esq., Pierce Atwood LLP, Portland, and R. Gregory Roberts, Esq. (orally), Roberts Law Group, PLLC, White Plains, New York, for appellant Express Scripts Inc. et al.

Aaron M. Frey, Attorney General, Thomas A. Knowlton, Dep. Atty. Gen. (orally), and Lawrence S. Delaney, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State Tax Assessor

Business and Consumer Docket docket number AP-2019-3
FOR CLERK REFERENCE ONLY